Charles G. RAIBLE, Defendant and Third-Party Plaintiff, Appellant,

v.

PUERTO RICO INDUSTRIAL DEVELOPMENT COMPANY et al., Appellees.

No. 6886.

United States Court of Appeals
First Circuit.
April 15, 1968.

Marcien Jenckes, Boston, Mass., and A. Torres Braschi, San Juan, P. R., with whom Robert S. Frank Jr., Winchester, Mass., and Dubon & Dubon, San Juan, P. R., were on brief, for appellant.

Juan Enrique Geigel, San Juan, P. R., with whom Guillermo Silva, Hernan G. Pesquera, Miguel A. Gimenez Munoz, San Juan, and Ernesto Rodriguez Font, Santurce, P.R., were on brief, for Puerto Rico Industrial Development Co., appellee.

Salvador E. Casellas, San Juan, P. R., with whom Fiddler, Gonzalez & Rodriguez, San Juan, P. R., was on brief, for Standard Steel & Tube Corp., appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

ALDRICH, Chief Judge.

The primary issue in the present suit is to determine the consequences of a pledgee's voting pledged stock in favor of a merger without notice to, or knowledge of the pledgor. The pledgor, appellant Raible, is a citizen of New York. The pledgee is Puerto Rico Industrial Development Company, PRIDCO, an agency of the Commonwealth of Puerto Rico; and the initial corporation involved, Standard Steel and Wire Company, hereafter Steel, a Puerto Rican corporation now merged, by virtue of the vote, into Standard Steel and Tube Company, hereafter Tube, another Puerto Rican corporation. The suit, brought by PRIDCO against Raible, was removed to the United States District Court for the District of Puerto Rico on the ground of diversity. In earlier stages it was held that Raible owed PRIDCO $48,000 as a guarantor of a lease from PRIDCO to Steel, of which Raible was a substantial stockholder. No issue as to this remains, except that Raible now claims that the obligation was satisfied as a result of PRIDCO's vote, the vote, in Raible's view, having the effect of foreclosing the pledge, and the agreement providing that in case the pledgee took over the stock, it should be valued at par.[1] Since the par value was $10 and 60,000 shares were involved, a foreclosure necessarily satisfied the debt under the terms of the agreement. However, since at the time of the vote the stock was perhaps worthless or virtually so, PRIDCO not unnaturally resists.

We must begin with a discussion of PRIDCO's extensive argument that it was not a pledgee of the stock. The agreement in question was executed February 26, 1957 between a bank, not presently involved, PRIDCO, Raible, and Steel. It recited that Raible had delivered certain shares of preferred stock of Steel, of which he was the owner, to PRIDCO, endorsed in blank, for transfer to PRIDCO or its nominee, to be held on certain terms and conditions. Sixty thousand of these shares were to be "held as collateral security for the fulfillment by Raible of his obligations as guarantor under the Lease Contract between PRIDCO, Standard Steel [Steel]

[1] "In the event that Raible shall default on his obligation as guarantor under the Lease Contract, PRIDCO shall be entitled to pay to itself the amount due to it as a result of such defaults by retaining for itself all rights, title and interest in and to some of or all paid 60,000 shares of Preferred Stock taken for the purpose at par value thereof or cash received in respect thereof."

This was not an invalid agreement. See 12A Fletcher, Private Corporations § 5645 (1957). Nor, in our opinion, was it in violation of P.R. Laws Ann. tit. 31, § 5030, providing for public sale of pledged property. The purpose of this statute was to assure the parties a fair evaluation of the pledged property. We see no reason why the parties could not agree on their own valuation.

and Raible \* \* \*" As a result of this PRIDCO caused Steel to issue to it a new certificate on which it appeared as owner. The issuance of the new certificate did not, of course, mean that PRIDCO did not continue to hold the stock simply as collateral, as all parties expressly agreed at the trial, and the court so found. Nonetheless, PRIDCO devotes much of its brief to indignant criticism of Raible for his "assumption" that PRIDCO was a pledgee. If PRIDCO makes any argument apart from this castigation, it is that it had legal title, and the word "pledgee" did not appear in the agreement. It then concludes that it was a trustee.

Passing the fact that at the trial PRIDCO expressly asserted that it was not a trustee, and the further and equally embarrassing fact that the word "trustee," also, does not appear in the agreement, it is elemental that a party's status does not depend upon the use of descriptive words, but is determined by the substantive rights that have been conferred upon him. As to certain other shares, which were held by PRIDCO for the benefit of another creditor, one could perhaps say that PRIDCO was a trustee. As to the 60,000 shares, PRIDCO understandably cites no case suggesting that a person holding property as collateral security can hold such as trustee for himself. Such a proposition is opposed to the entire trustee-beneficiary concept. See Willett v. Herrick, 1927, 258 Mass. 585, 155 N.E. 589. A person holding property as collateral security for his own benefit is precisely a pledgee, by definition. Black's Law Dictionary 1312–13 (4th ed. 1951).

■ The fact that the agreement, not too artfully drawn in the light of the many matters it sought to cover, may leave room for the argument that legal title as to the 60,000 shares was in PRIDCO, cannot be taken to destroy its obvious general intent. Abstract ambiguities of title, particularly when it is admittedly defeasible, like inaccurate use of legal terminology, cannot overcome a demonstrated purpose. We hold that the purpose, so far as the 60,000 shares were concerned, was that the relationship of the parties was what in law is described as pledgor-pledgee.

■ As pledgee PRIDCO possessed a viable[2] election to take over the stock. Before assessing Raible's claim that, because voting was a right of ownership not possessed by a pledgee, when PRIDCO assumed that right it must be held to have taken over the ownership which supported it, we must evaluate the underlying basis for it. There is no specific mention of voting rights in the agreement. Raible accordingly turns to Puerto Rican corporate law, P.R.Laws Ann. tit. 14, § 1705, which recites that the pledgor shall have the right to vote unless he has expressly empowered the pledgee on the books of the corporation.[3] The difficulty with this argument lies in section 1509 of the same title. This provides that when shares are transferred for a limited purpose, as by pledge, "it shall be so expressed in the entry of the transfer." We must read these sections together. If there is no expressed limitation in the transfer, and the transferee appears on the corporate books to be the unrestricted owner, section 1705 is inapplicable. Canadian Improvement Co. v. Lea, 1908, 74 N.J.Eq. 234, 69 A. 455.

So far as the corporation is concerned, the books control. P.R.Laws Ann. tit. 14, § 1708. Moreover, since the agreement permitted PRIDCO to obtain this right vis-a-vis the corporation, and made no

2. At the time of the vote Raible's obligation secured by the pledge had already matured.

3. "§ 1705. Voting rights of fiduciaries and pledgors.
　　Persons holding stock in a fiduciary capacity shall be entitled to vote the shares so held, and persons whose stock is pledged shall be entitled to vote, unless in the transfer by the pledgor on the books of the corporation he has expressly empowered the pledgee to vote thereon, in which case only the pledgee, or his proxy may represent said stock and vote thereon."

separate provisions for voting rights as between the parties themselves even though it might have done so, see 5 Fletcher, Private Corporations § 2034 (1967), we think it reasonable to assume that Raible was content that as a normal matter PRIDCO should possess the voting rights which, on the books, it appeared to have. In this circumstance it is not inappropriate to attach some weight to the provision in the agreement that, with respect to the preferred stock, Raible shall have "only" the right to dividends and certain rights of redemption.

It does not follow that as between the parties PRIDCO had the right to cast the particular vote that it did, which was not merely to merge Steel into Tube, but was to exchange Raible's $10 preference shares for common stock with a par value of one cent. For this we review briefly the circumstances.

By 1963 the affairs of Steel were in serious condition, and it was obvious that substantial new money was required. There were apparently reasons why this support could be more effectively rendered in the framework of a new corporate arrangement, and it was accordingly decided to merge Steel into Tube. The testimony does not go into all of the reasons, but one logical one was to reduce Steel's preferred stock so that the common stockholders of the revitalized company would be in an improved position. The asserted economic justification was that the preferred stock had already become worthless. At the same time, there must have been some advantage in merging Steel into Tube rather than abandoning Steel and simply starting a new company.

Although PRIDCO insists that Raible continued to be the owner of the stock throughout this period, instead of consulting him with respect to the proposed alteration in the res of the pledge, PRIDCO sought counsel's opinion whether it could vote Raible's stock without asking his approval. Nor can it suggest that there existed any circumstances requiring haste; this aspect of the merger was agreed upon by all save Raible, who had no notice of the transaction, for over a year before the actual vote. Reviewing the record, the conclusion seems inescapable that PRIDCO, for some undisclosed reason, did not wish interference from Raible. It does not require much speculation to conclude that PRIDCO, not unnaturally, expected that Raible would resist the transformation of his ten dollar par preferred stock into one cent par common, especially if the terms of the prior agreement were to remain unaltered.

Asked at the trial why he voted for the merger, Mr. Ondina, PRIDCO's then principal officer, testified that it was for the benefit of owners of the preferred stock, which at the time had no value, since PRIDCO believed the stock in the new company would have a much greater value. He further asserted that the stock was still being held under the terms of the agreement, so that any increase in value would be for the benefit of Raible. However, passing the question whether a court of equity would permit PRIDCO to take such action, after the merger it was PRIDCO which in terms had the option of enjoying any increase in the value of the stock by foreclosing under the agreement at par value of one cent, a 1000% reduction of the agreed valuation.

As we have suggested, even if we accept the contention that under the agreement ordinary voting rights were in the pledgee, there are some votes which cannot be justified by this authority. We think this was such a vote. Initially, it constituted a change in the very nature of the pledged property, rendering the return of the res on tender of payment of the secured debt impossible. Further, it resulted in a substantial change of the terms of the agreement. Nor can it be suggested that Raible ratified this action. Informed of it by PRIDCO after the event, he promptly responded that it constituted an "arbitrary confiscation" of his stock. We find it difficult to disagree.

Under these circumstances, we think that PRIDCO is subject to the principle that one who has a right to become the owner of property, and whose subsequent actions towards the property can be justified only on the theory that it was the owner, will be held in law to have exercised its election. Farmers' Handy Wagon Co. v. Newcomb, 1916, 192 Mich. 634, 159 N.W. 152; cf. Lasky v. Economy Grocery Stores, 1946, 319 Mass. 224, 65 N.E.2d 305, 163 A.L.R. 235. Whether this action was due to bad advice, bad management, or intentional misconduct is beside the point. "Where the offeree's exercise of dominion is also tortious, the offeror may treat it as an acceptance in spite of the offeree's manifestation of intention not to accept." 1 Williston, Contracts § 91D at 334 (3d ed. 1957). PRIDCO's claim against Raible can rise no higher than the agreements which established it, and he had as much right to insist that they be respected as does PRIDCO. It follows that under the agreement Raible is entitled to a credit of ten dollars a share against the $48,000 due from him to PRIDCO, discharging the indebtedness.

We deal but briefly with Raible's third party claim against Steel (and hence, apparently, against Tube) asserting that he is entitled to reimbursement for having to respond to his $48,000 "guaranty" of Steel's rental obligation. Inasmuch as Steel's liability for rent was expressly conditioned on its realizing a net income, and Raible undertook the obligation to pay, up to $48,000, if Steel did not pay, not only was Raible's obligation independent, but to permit him to claim over against Steel when it had no net income, would be directly contrary to the whole tenor of the agreement relieving Steel of liability under such circumstances. The appeal in this respect is so frivolous that Tube is entitled to double costs.

Finally, so far as Raible's counterclaim against PRIDCO for conversion of the balance of his preferred stock is concerned, this is a separate matter and the agreement's liquidated figure did not apply. Since Raible failed to prove any value for that stock, the difference between awarding him nominal damages and dismissing the counterclaim does not appear to us as prejudicial.

The judgment in favor of PRIDCO on its complaint is vacated, and judgment thereon, with costs, is to be entered in the district court in favor of Raible. The judgment on the counterclaim and on the third party complaint is affirmed, with double costs to defendant Standard Steel and Tube Corporation in this court.