In re David F. LaROCHE.

David F. LaROCHE, Appellant,

v.

AMOSKEAG BANK, Appellee.

No. 91–1989.

United States Court of Appeals,
First Circuit.

Argued Feb. 3, 1992.

Decided July 17, 1992.

Mal A. Salvadore with whom Sondler, Salvadore & Dicristofaro, Providence, R.I., was on brief, for appellant.

Gordon P. Cleary with whom Vetter & White, Providence, R.I., was on brief, for appellee.

Before CYR, Circuit Judge, and COFFIN and CAMPBELL, Senior Circuit Judges.

CYR, Circuit Judge.

David F. LaRoche appeals the order for relief entered against him in an involuntary chapter 11 case commenced by the filing of a creditors' petition by Dartmouth Bank ("Dartmouth"), Amoskeag Bank ("Amoskeag"), and Connecticut National Bank d/b/a Shawmut Bank ("Shawmut"). *See* Bankruptcy Code § 303(b)(1), 11 U.S.C. § 303(b)(1). At the bankruptcy court hearing on the merits of the contested petition, Suffield Bank ("Suffield") was permitted to join the creditors' petition, and the order for relief was granted. The district court affirmed.[1]

## DISCUSSION

LaRoche advances three claims. First, he asserts that the creditors' petition was

---

1. *In re LaRoche,* 131 B.R. 253 (D.R.I.1991).

defective because one of the three petitioning creditors, Amoskeag, acted in "bad faith," thereby tainting the petition beyond cure by Suffield's subsequent joinder pursuant to Bankruptcy Code § 303(c), 11 U.S.C. § 303(c). *See infra* note 2. Second, LaRoche challenges Shawmut's status as a petitioning creditor under Bankruptcy Code § 303(b)(1), on the grounds that the creditors' petition was not signed by its attorney and Shawmut did not appear at the hearing on the contested petition. Third, LaRoche claims that Suffield's joinder in the contested creditors' petition on the day of the hearing resulted in unfair surprise and prejudice.

On intermediate appeal to a district court, a final order of the bankruptcy court is subject to the same familiar standards of review normally employed in direct appeals to the courts of appeals in civil cases generally. The district court accepts all bankruptcy court findings of fact unless "clearly erroneous," Fed.R.Bankr.P. 8013, but reviews rulings of law *de novo*. *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1543 (10th Cir.1988). The court of appeals then undertakes an independent review of the bankruptcy court order, utilizing the same appellate standards governing the district court review. *In re G.S.F. Corp.*, 938 F.2d 1467, 1474 (1st Cir.1991) (in an appeal from the decision of a district court on intermediate appeal from the bankruptcy court, the court of appeals "independently reviews the bankruptcy court's decision, applying the clearly erroneous standard to findings of fact and de

novo review to conclusions of law"). Where the district court findings conflict with those of the bankruptcy court, "it is the bankruptcy court's findings of fact that receive clearly erroneous review, not the contrary findings of the district court."). *Id.*

### A. Code Section 303(b)(1) and the Existence of a Bona Fide Dispute

LaRoche contends that Amoskeag either knew or should have known when it joined the creditors' petition that its claim against LaRoche was the subject of a bona fide dispute under New Hampshire law; and, therefore, "bad faith" tainted the creditors' petition, precluding effective joinder by Suffield pursuant to 11 U.S.C. § 303(c). *See, e.g., Myron M. Navison Shoe Co. v. Lane Shoe Co.*, 36 F.2d 454, 459 (1st Cir. 1929) (creditor's knowing and fraudulent attempt to confer jurisdiction on bankruptcy court where none exists merits dismissal of involuntary petition) (Bankruptcy Act case).[2]

On December 7, 1989, Laroche borrowed approximately $3 million from Amoskeag, secured by a pledge of 208,250 shares of common stock and by his promise to pledge an additional 5,000 shares by March 8, 1990. The pledge provided, in pertinent part:

The Bank [Amoskeag] may, *at its option without notice* (i) *transfer into its name or the name of its nominees all or any part of the collateral, including stock, bonds, and other securities,* (ii) demand,

---

**2.** Bankruptcy Code § 303 provides, in pertinent part:

(b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

(1) by three or more entities each of which is ... a holder of a claim against such person that is not contingent as to liability *or the subject of a bona fide dispute* ..., if such claims aggregate at least $5,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

....

(c) After the filing of a petition under this section but before the case is dismissed or relief is granted, a creditor holding an unse-

cured claim that is not contingent, other than a creditor filing under subsection (b) of this section, may join in the petition with the same effect as if such joining creditor were a petitioning creditor under subsection (b) of this section.

Bankruptcy Code § 303(b)(1), (c), 11 U.S.C. § 303(b)(1), (c) (emphasis added).

Bankruptcy Code § 303(b)(1) would require three petitioning creditors in the present case. LaRoche argues that Amoskeag's "bad faith" must be *imputed* to the other petitioning creditors, Dartmouth and Shawmut, in order to deter creditor collusion and coercion. As we conclude that Amoskeag's claim was not subject to bona fide dispute, hence its joinder could not have been in bad faith, we need not address LaRoche's imputation argument.

sue for, collect and receive all interest, dividends, including liquidated dividends, and other proceeds thereof, and *hold the same as security for payment* of the obligations or, if cash proceeds, apply the same in payment thereof, (iii) notify any person obligated on any of the collateral of the Bank's security interest therein and request that such person make payment directly to the Bank or (iv) demand, sue for, collect or make any settlement or compromise the Bank deems desirable with respect to any of the collateral.

. . . .

Upon any event of default hereunder ... without any demand or notice, except as may be required by applicable law, the Bank may *sell or otherwise dispose* of any and all of the Collateral and may exercise any and all rights and remedies accorded by law, all as the [sic] Article 9 of The New Hampshire Uniform Commercial Code ... may determine. (Emphasis added).

On or about March 29, 1990, Amoskeag provided LaRoche with written notice of default for failing to (1) make timely interest payments, (2) pledge the additional 5,000 shares by March 8, and (3) direct dividend payments to Amoskeag. The notice of default invoked the acceleration provisions in the loan agreements and concluded:

We further give notice to you that we intend to *protect* and to enforce our rights and remedies in respect of our collateral in which we were granted a security interest by you *pursuant to the Security Documents. Such actions shall in no event constitute a waiver or other impairment of any of our other rights or remedies which we have under*

or in respect of the Notes, the Security Documents or in respect of our collateral, or arising by applicable law or otherwise, *all of such rights and remedies being cumulative and not exclusive.* (Emphasis added).

On May 3, 1990, Amoskeag caused the pledged shares to be transferred into its own name on the books of the issuing corporation. Shortly thereafter, Amoskeag informed LaRoche that it intended to sell the pledged shares. On June 22, 1990, LaRoche's attorney sent a letter to Amoskeag warning that the pledged shares, "owned by Mr. LaRoche, in his own name or beneficially," were "restricted" securities, and could not be resold absent strict compliance with the SEC rules and regulations prescribed pursuant to the Securities Act of 1933. *See* 17 C.F.R. § 230.-144 (1991).[3] Trading in the shares of the issuing corporation was halted on July 6, 1990.

Unable to sell the pledged shares, Amoskeag commenced an action in the United States District Court for the District of New Hampshire to recover its loan indebtedness. LaRoche raised the defense of payment, arguing that Amoskeag's reregistration of the pledged shares, which allegedly "exceeded its rights under the Collateral Pledge Agreement," constituted a proposal to accept and retain the collateral in full satisfaction of the indebtedness pursuant to Article 9 of the New Hampshire Uniform Commercial Code.[4]

Article 9 of the Uniform Commercial Code (U.C.C.) permits a secured creditor to elect among several alternative remedies in the event of a default by the debtor. Under the "disposition" option in U.C.C. § 9–504, the secured creditor "may sell, lease,

---

**3.** Rule 144 generally prohibits resale of "restricted" securities, unless (1) the issuing corporation previously has made available specified public information; (2) the seller has held the securities for a minimum period (*e.g.,* two years) in advance of any resale; (3) the seller disposes of the shares in small allotments in specified brokers' transactions; and (4) the seller files written notice with the SEC. 17 C.F.R. § 230.144.

**4.** N.H.Rev.Stat.Ann. § 382–A:9–505(2) (1961 & Supp.1991) provides, in pertinent part:

[A] secured party in possession [of collateral] may, after default, *propose to retain* the collateral in satisfaction of the obligation. *Written notice of such proposal* shall be sent to the debtor.... If the debtor ... objects in writing within thirty days from the receipt of the notification ... the secured party must dispose of the collateral under Section 9–504. In the absence of such a writing the secured party may retain the collateral in satisfaction of the debtor's obligation. (Emphasis added).

or otherwise dispose of any or all of the collateral," as long as it does so in a "commercially reasonable manner." If the proceeds from any such disposition of the collateral are less than the amount due on the secured indebtedness, the secured creditor may attempt to recover the deficiency. *See, e.g., Lamp Fair, Inc. v. Perez–Ortiz,* 888 F.2d 173, 176–78 (1st Cir.1989); *see generally* 2 James J. White & Robert S. Summers, *Uniform Commercial Code* § 27–8, at 588 (3d ed. 1988).

■ On the other hand, the "retention" or "strict foreclosure" option available under U.C.C. § 9–505(2), relied on by La-Roche, permits the secured creditor to notify the debtor that it intends to retain the collateral in *complete satisfaction* of the indebtedness. Unless the debtor objects, the secured creditor thereby "forecloses" on its collateral and "waives" any deficiency claim against the debtor. Thereafter, the secured creditor bears the risk of any diminution in the value of the collateral. *See Lamp Fair,* 888 F.2d at 176.

U.C.C. § 9–505(2) expressly applies only if the debtor is served with *written notice* of the secured creditor's proposal to pursue the "strict foreclosure" remedy. LaRoche concedes that Amoskeag provided no such notice. *See, e.g., Warnaco, Inc. v. Farkas,* 872 F.2d 539, 544–45 (2d Cir.1989) (no strict foreclosure absent written notice by creditor; burden rests on debtor to demand express election). LaRoche contends, nonetheless, that the New Hampshire courts may yet adopt an alternative interpretation of U.C.C. § 9–505(2), which might save the day. Under the "implied election" theory, the absence of written notice of election by

the secured creditor would not bar the debtor's recourse to U.C.C. § 9–505(2) as a *defense to payment* of the debt if the secured creditor (1) failed to dispose of the collateral within a "reasonable" time after default (*e.g.,* pursuant to an election under § 9–504), or (2) engaged in other conduct (*e.g.,* interim use of collateral) that indicates an intent to retain the collateral and waive any deficiency. *See, e.g., In re Boyd,* 73 B.R. 122, 124–25 (N.D.Tex.1987) (bank's actual use of repossessed boat for three-month period constituted implied election under § 9–505). LaRoche argues that Amoskeag's reregistration of the pledged securities in its own name could constitute conduct indicating an intent to retain the securities and waive any deficiency—and so, an implied election under the New Hampshire Uniform Commercial Code. Amoskeag's actual or constructive knowledge of this bona fide defense to payment, LaRoche argues, was enough to have precluded any finding that Amoskeag joined the creditors' petition in good faith.[5] Since the documentary evidence conclusively establishes that LaRoche's defense is unfounded, we are unable to agree.

■ LaRoche's payment defense was based entirely on the allegation that Amoskeag's reregistration of the pledged securities "in its own name ... exceed[ed] its] rights under the Collateral Pledge Agreement." But the allegation is patently incorrect. The pledge agreement explicitly authorized Amoskeag to transfer the pledged shares into its own name *at its option* and *without notice.* The language of the transfer provision is *not* conditioned on default; Amoskeag could cause the

**5.** The district court treated LaRoche's defense of payment as tantamount to a contention that the proceeds from the sale of the pledged shares would have been more than sufficient to satisfy his entire indebtedness if Amoskeag had sold the shares *immediately* after their reregistration. *In re LaRoche,* 131 B.R. at 257. The court considered the defense "disingenuous," especially in light of LaRoche's written warning to Amoskeag that the restricted shares could not be sold except in compliance with onerous SEC regulations, and in view of LaRoche's testimony in an unrelated case that the actual market for the issuing corporation's shares would not have allowed Amoskeag to dispose of the bulk of the

pledged shares within the nine-week period preceding the halt in trading. *Id.* LaRoche challenges the district court's reliance on this apparent self-contradiction, on the ground that the court misapprehended his § 9–505(2) defense. If the reregistration of the pledged securities did constitute a strict foreclosure under § 9–505, he contends, the *entire* debt would have been extinguished, and any post-registration depreciation in the pledged shares suffered by Amoskeag would be immaterial to LaRoche's payment defense. Rather than review the district court's analysis, therefore, we address the claim presently posed by LaRoche.

pledged shares to be transferred on the books of the issuing corporation *at any time.* Pledges of investment securities routinely empower the secured creditor to transfer the pledged securities on the books of the issuing corporation as a means of enabling the secured creditor to collect dividends and vote the shares during the term of the loan. *Cf., e.g., Raible v. Puerto Rico Indus. Dev. Co.,* 392 F.2d 424, 426 (1st Cir.1968) (although secured creditor exceeded its voting authority under pledge agreement, provision permitting it to register pledged shares in its own name afforded creditor ordinary voting rights).

Furthermore, the intent of the transfer provision is evident from its context. It is one of four related provisions affording Amoskeag various options for *protecting* its collateral by transferring the securities into its own name, and for *preserving* its collateral by receiving dividends and voting the shares. *See supra* p. 1302. Thus, LaRoche's default, including the failure to deliver the additional 5000 shares required under the pledge agreement, as well as the failure to honor Amoskeag's request to remit dividends, jeopardized Amoskeag's security interest.

The March 29 notice of default and acceleration specifically informed LaRoche of Amoskeag's intent to "protect" its collateral by invoking the enumerated rights reserved in the pledge agreement, and emphasized that none of Amoskeag's protective measures was to be viewed as a "waiver" of any unexercised right. The subsequent transfer of the securities into its own name would entitle Amoskeag, as the "record owner," to *direct* payment of dividends, which Amoskeag would then "hold ... as security for payment of the obligations." *See supra* p. 1302; *see also* N.H.Rev.Stat.Ann. § 293–A:30 (closing of corporate transfer books and fixing of record date for voting and dividends). Prior to an explicit act of foreclosure, however, LaRoche remained their beneficial owner.[6]

The March 29 notice expressly disavowed any *implicit* "waiver" of Amoskeag's rights or remedies (including its right to recover any deficiency) that might otherwise be inferred from the exercise of any option *expressly reserved in the pledge agreement. See supra* p. 1302.[7] Even if an act of post-default reregistration could be considered an "implied election" under U.C.C. § 9–505(2), the plain language of the pledge agreement precluded LaRoche's contention that Amoskeag knew or should have known that its reregistration of the pledged securities might constitute an implied waiver of its deficiency claim. On the contrary, given the clear import of the documentary evidence,[8] it is clear that LaRoche expressly foreclosed any bona fide "implied election" defense.[9] We conclude,

---

**6.** The communications between Amoskeag and LaRoche *following* the reregistration were likewise inconsistent with any characterization of the reregistration as an implied election to resort to strict foreclosure. Had Amoskeag viewed the reregistration as a strict foreclosure, LaRoche's beneficial interest in the securities would have terminated, and Amoskeag would not have been required to notify LaRoche of its intent to sell the securities pursuant to U.C.C. § 9–504.

**7.** It is ironic that LaRoche, who would impute an elective intent under U.C.C. § 9–505(2) based on Amoskeag's *silence,* relies on an alleged act of "strict foreclosure" (reregistration) as to which Amoskeag explicitly disclaimed any duty to notify LaRoche. Since it is undisputed that Amoskeag was empowered to transfer the securities *before* any default, it would be far more reasonable to expect Amoskeag to provide written notice to LaRoche if the act of reregistration

were meant to take on any different or added significance (*e.g.,* foreclosure) beyond that defined in the pledge agreement.

**8.** Since we conclude that the pledge agreement and the notice of default would preclude an "implied election" defense, *as a matter of law,* remand is unnecessary. *See, e.g., In re Crown Sportswear, Inc.,* 575 F.2d 991, 993 (1st Cir.1978) (if "record facts [relevant to "bad faith"] are clear and undisputed and not susceptible of interpretation, we resist the temptation to remand"); *see also Bartmann,* 853 F.2d at 1544 ("'court must determine whether there is an *objective* basis for either a factual or a *legal* dispute as to the validity of debt.'") (quoting *In re Busick,* 831 F.2d 745, 750 (7th Cir.1987)) (emphasis added).

**9.** LaRoche has not shown that Amoskeag *refused* to make an election. In any case, under

accordingly, that Amoskeag's joinder in the creditors' petition was undertaken in good faith and, therefore, did not preclude the subsequent joinder by Suffield. *See infra* pt. C.

### B. *Shawmut's Joinder*

 The contention that Shawmut did not join the creditors' petition, in that the petition was signed by an officer of Shawmut rather than counsel of record, is simply wrong. Official Form 11 ("Involuntary Case: Creditors' Petition") and Bankruptcy Rule 9011 both contemplate the signing of a creditors' petition by a duly authorized lay person.[10] *See also* Bankruptcy Code § 101(42), 11 U.S.C. § 101(42) (definition of "petition"). Official Form 11 expressly states: "Petitioners sign if not represented by an attorney." As there is no contention that the officer who executed the creditors' petition in behalf of Shawmut was unauthorized, and Shawmut was not yet represented by counsel, the signing requirements imposed by Bankruptcy Rule 9011 were met.

 The second challenge to Shawmut's status as a petitioning creditor asserts that Shawmut was unrepresented at the hearing on the merits of the contested creditors' petition. Corporate entities are not allowed to participate at bankruptcy court hearings except by counsel. *In re Las Colinas Dev. Corp.*, 585 F.2d 7, 13 (1st Cir.1978), *cert. denied*, 440 U.S. 931, 99 S.Ct. 1268, 59 L.Ed.2d 487 (1979). The record indicates, however, that Shawmut did *not* participate at the hearing on the

contested creditors' petition. Instead, the court conditionally ruled that Shawmut appear by counsel within twenty-four hours after the hearing, without deciding whether it need be represented at all. Later, *at the request of LaRoche*, the bankruptcy court ordered Shawmut disqualified unless its counsel entered an appearance, and Shawmut appeared within the allotted time.

 The district court correctly determined that LaRoche had acquiesced in this resolution of the representation issue, thereby waiving the present claim. Indeed, LaRoche played an active role in fashioning the resolution adopted by the bankruptcy court. Moreover, at no time did LaRoche suggest to the bankruptcy court that Shawmut should be disqualified *notwithstanding* its later appearance by counsel.[11] As we have said on numerous occasions, we do not consider claims not raised in the trial court. *In re 604 Columbus Ave. Realty Trust*, 968 F.2d 1332, 1343 (1st Cir.1992) ("It is the general rule in this circuit that arguments not raised in the trial court cannot be raised for the first time on appeal."); *In re Boston Shipyard Corp.*, 886 F.2d 451, 455 (1st Cir.1989) (argument not raised before bankruptcy court will not be reviewed on appeal); *Clauson v. Smith*, 823 F.2d 660, 666 (1st Cir.1987) ("we have regularly declined to consider points which were not seasonably advanced below"); *Johnston v. Holiday Inns, Inc.*, 595 F.2d 890, 894 (1st Cir.1978) ("an issue not presented to the trial court cannot be raised for the first time on appeal").[12]

---

U.C.C. § 9-507(1) the debtor may compel the secured creditor to elect between the remedies provided in §§ 9-504 and 9-505 if, for instance, the value of the collateral is decreasing and an immediate disposition would prevent the debtor's obligation from becoming undersecured, thereby resulting in a larger deficiency.

10. Bankruptcy Rule 9011 states:
Every petition ... filed in a case under the Code on behalf of a party represented by an attorney ... shall be signed by at least one attorney of record.... *A party who is not represented by an attorney shall sign all papers.... If a document is signed in violation of this rule, the court ... shall impose on the person who signed it ... an appropriate sanction....*

Fed.R.Bankr.P. 9011 (emphasis added).

11. At the time it made its initial ruling permitting Shawmut 24 hours to appear by counsel, the bankruptcy court allowed LaRoche to reserve any further objection to Shawmut's status as a petitioning creditor in the event its counsel did *not* enter a timely appearance. No objection was asserted or reserved as to the procedure adopted by the bankruptcy court, let alone as to Shawmut's status in the event its counsel did enter an appearance within the allotted time.

12. Even if we were to entertain the present claim, it would fail. There is no suggestion that the creditors' petition was not duly executed by

**1306**

## C. *Suffield's Joinder*

 Finally, LaRoche claims unfair surprise and prejudice as a consequence of the bankruptcy court decision allowing Suffield to join the creditors' petition. LaRoche neither objected to Suffield's joinder on the ground of prejudice,[13] nor requested a continuance to permit the discovery he now says was necessary.[14] Thus, the issue was not preserved for appeal. *See, e.g., In re 604 Columbus Ave. Realty Trust,* 968 F.2d at 1343; *United States v. Diaz–Villafane,* 874 F.2d 43, 47 (1st Cir.), *cert. denied,* 493 U.S. 862, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989) (claim of surprise is "severely undermined, if not entirely undone," by failure to request continuance).[15] Moreover, as the district court correctly noted, no prejudice was occasioned by Suffield's joinder on the day of the hearing, as LaRoche was well aware of the nature of the Suffield judgment claim, to which he raised no defense or challenge whatever.[16]

*Affirmed; double costs to appellee.*

an authorized officer of Shawmut. And there is nothing to indicate that Shawmut's participation in the hearing on the contested creditors' petition was required, any more than the holder of a duly-filed proof of claim need participate in the bankruptcy proceedings prior to the time it is called upon to defend its claim or otherwise respond. At no time did LaRoche question the validity of the Shawmut claim, or challenge Shawmut's allegation that its claim was not subject to bona fide dispute. There was no prejudice to any party, let alone LaRoche, as a consequence of the 24 hour grace period.

**13.** The only opposition raised by LaRoche below was that Suffield's joinder was precluded by Amoskeag's bad faith. *See supra* pt. A.

**14.** In fact, LaRoche agreed to Suffield's request for a recess in the bankruptcy court hearing, on the condition that the recess not delay a decision on the creditors' petition.

**15.** Even on appeal LaRoche identifies no witness or documentary evidence he would have presented or discovered relating to Suffield's joinder.

**16.** More than two months before the bankruptcy court hearing, Suffield obtained a $550,000 judgment against LaRoche—the basis for the claim Suffield sought to protect by joining in the creditors' petition. *See Suffield Bank v. LaRoche,* 752 F.Supp. 54 (D.R.I.1990). As LaRoche took no appeal, the judgment became final. Thus, Suffield's joinder could have resulted in no cognizable surprise or prejudice to LaRoche.