UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1971

BERNARD P. ROME,

Appellant,

v.

JOSEPH BRAUNSTEIN, ETC.,

Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Selya, Circuit Judge,

Bownes, Senior Circuit Judge,

and Cyr, Circuit Judge.

Bernard P. Rome, with whom Rome, George & Klein was on brief

for appellant.
Isaac H. Peres, with whom Riemer & Braunstein was on brief

for appellee.

March 22, 1994

CYR, Circuit Judge. Bernard P. Rome, Esquire, appeals
CYR, Circuit Judge.

from a district court order entered on intermediate appeal,

affirming a bankruptcy court ruling under Bankruptcy Code

328(c) disallowing Rome's application for fees as court-appointed

counsel to chapter 7 debtor Chestnut Hill Mortgage Corporation

(CHM) due to disqualifying conflicts of interest. Finding no

error, we affirm.

I

BACKGROUND

As its longtime corporate clerk and counsel, Rome filed

a chapter 11 petition in behalf of CHM in November 1989, followed

by an application for Rome's appointment as counsel to the

chapter 11 debtor in possession pursuant to Bankruptcy Code

1107(a), 11 U.S.C. 1107(a); see also id. 327(a), 11 U.S.C.

327(a). Thereafter, as counsel to the debtor in possession,

Rome filed three abortive chapter 11 reorganization plans propos-

ing a 20% dividend to general creditors. Various CHM creditors

successfully resisted these initiatives, however, on the ground

that the plans would unfairly advantage certain CHM insiders

including its president and sole shareholder, Arnold Leavitt, and

Leavitt's family and friends by providing priority repayment

of their prepetition "loans" to CHM. In August 1990, after all

three plans failed to win creditor approval, the bankruptcy court

acceded to creditor demands for the appointment of a chapter 11

trustee, appellee Joseph Braunstein, and to Braunstein's reten-

2

tion of Riemer and Braunstein (R & B) as counsel to the chapter

11 trustee.

Meanwhile, three months before Braunstein's appointment

as the CHM chapter 11 trustee, an involuntary chapter 7 petition

had been filed against Arnold Leavitt. Shortly thereafter, while

still serving as counsel to CHM in its chapter 11 case, and with

bankruptcy court authorization, Rome began to serve as counsel to

Arnold Leavitt in the involuntary chapter 7 proceeding. As

chapter 11 trustee, appellee Braunstein began negotiations with

Rome, by then also representing one Sandra Dickerman, Arnold

Leavitt's secretary at CHM, in her ultimately successful bid to

purchase property belonging to the CHM chapter 11 estate. In

March 1991, less than two months after the bankruptcy court

approved the Dickerman acquisitions from CHM, the CHM chapter 11

proceedings were converted to chapter 7 and Braunstein was

appointed the CHM chapter 7 trustee.

Late in 1991, Braunstein, R & B, and Rome filed appli-

cations for compensation and reimbursement of expenses. The

Braunstein application, as chapter 11 and chapter 7 trustee, and

the R & D application as counsel to the chapter 11 and chapter 7

trustee, approximated $81,000 in fees. The Rome request, as

counsel to CHM qua debtor and chapter 11 debtor in possession,

approximated $62,000. The applications were opposed by CHM

creditors; additionally, Braunstein, as the CHM chapter 7 trust-

ee, opposed the Rome application.

3

At the hearing held on these fee applications, Braun-

stein represented to the bankruptcy court that he intended to set

aside certain prepetition transfers of CHM assets as either

preferential or fraudulent. Creditors represented to the court

that Arnold Leavitt had "looted" CHM prior to Rome's filing of

the CHM chapter 11 petition, by transferring CHM assets to

Leavitt family members, and that Rome, in an effort to further

Leavitt's interests at the expense of CHM and its creditors,

repeatedly "obstructed" creditor efforts to investigate CHM's

financial condition and to promote its reorganization. The

bankruptcy court ultimately allowed the Braunstein and R & B fee

applications in full. On the other hand, the court disallowed

the Rome application entirely, on two grounds: (1) Rome's

contentious tenure as counsel to the debtor in possession "pro-

duced virtually no benefit to creditors and loan participants";

and (2) Rome's concurrent representation of CHM and Leavitt, as

well as CHM and Dickerman, was "patently inappropriate." The

district court affirmed.

II

DISCUSSION

The Bankruptcy Code imposes particularly rigorous

conflict-of-interest restraints upon the employment of profes-

sional persons in a bankruptcy case.

Except as otherwise provided in this section,
the trustee, with the court's approval, may

employ one or more attorneys, accountants,

4

appraisers, auctioneers, or other profession-
al persons, that do not hold or represent an

interest adverse to the estate, and that are

disinterested persons, to represent or assist

the trustee in carrying out the trustee's
duties under this title.

Bankruptcy Code 327(a), 11 U.S.C. 327(a) (emphasis added).

See Fed. R. Bankr. P. 2014; In re Cropper Co., 35 B.R. 625, 629-

30 (Bankr. M.D. Ga. 1983) (noting "strict standards" unique to

bankruptcy); see also Bankruptcy Code 1107(a), 11 U.S.C.

1107(a) ( 327(a) applicable to counsel representing debtor in

possession); In re Roberts, 46 B.R. 815, 822 (Bankr. D. Utah

1985). Moreover, as the bankruptcy court is invested with ample

power to deter inappropriate influences upon the undivided

loyalty of court-appointed professionals throughout their tenure,

the need for professional self-scrutiny and avoidance of con-

flicts of interest does not end upon appointment. The court "may

deny allowance of compensation . . . if, at any time during such

. . . employment . . . , such professional person is not a

disinterested person, or represents or holds an interest adverse

to the interest of the estate . . . ." Bankruptcy Code 328(c),

11 U.S.C. 328(c) (emphasis added). Thus, section 328(c)

authorizes a "penalty" for failing to avoid a disqualifying

conflict of interest. See S. Rep. No. 989, 95th Cong., 2d Sess.

39 (1978).

5

Although the Code idiom "interest adverse" is not

defined,1 the companion requirement that appointees be "dis-

interested" is defined, see Bankruptcy Code 101(14), 11

U.S.C. 101(14), as including, inter alia, one who is "not a

creditor, an equity shareholder, or an insider," nor presently,

or "within two years before [bankruptcy], a[n] . . . officer

. . .of the debtor," and does not have "an interest materially

adverse to the interest of the estate or of any class of credi-

tors or equity security holders" for "any reason." Id. (emphasis

added); see In re Martin, 817 F.2d 175, 179 (1st Cir. 1987).

These statutory requirements disinterestedness and no interest

adverse to the estate serve the important policy of ensuring

that all professionals appointed pursuant to section 327(a)

tender undivided loyalty and provide untainted advice and assis-

tance in furtherance of their fiduciary responsibilities.2

1However, an "adverse interest" has been described in
pragmatic terms as the "possess[ion] or assert[ion] [of] mutually
exclusive claims to the same economic interest, thus creating
either an actual or potential dispute between rival claimants as
to which . . . of them the disputed right or title to the inter-
est in question attaches under valid and applicable law; or (2)
[the possession of] a predisposition or interest under circum-
stances that render such a bias in favor of or against one of the
entities." In re Roberts, 46 B.R. at 826-27.

2Rome argues on appeal that he not only disclosed his
position as the clerk of CHM but could reasonably have believed
that such a ministerial position would not make him a corporate
"insider" within the meaning of Bankruptcy Code 101(31), 11
U.S.C. 101(31). We express no view on these claims, and
confine our holding to Rome's impermissible representation of two
other clients (Leavitt and Dickerman) with "interests adverse" to
the CHM estate which he was responsible for representing by court
appointment.

6

In the exercise of its own ongoing affirmative respon-

sibility to "root out impermissible conflicts of interest" under

Bankruptcy Code 327(a) and 328(c), the bankruptcy court must

determine whether any competing interest of a court-appointed

professional "created either a meaningful incentive to act

contrary to the best interests of the estate and its sundry

creditors an incentive sufficient to place those parties at

more than acceptable risk or the reasonable perception of

one." Martin, 817 F.2d at 180 (emphasis added). The test is

neither subjective, nor significantly influenced by the court-

appointed professional's "protestations of good faith," as Rome

would have it, see, e.g., supra note 2, but contemplates an

objective screening for even the "appearance of impropriety."

Id. at 180-81, 182. Finally, if its fact-specific inquiry leads

the bankruptcy court to conclude that an impermissible conflict

of interest looms or exists, available sanctions include disqual-

ification and the denial or disgorgement of all fees. Id. at

182-83. See Bankruptcy Code 328(c), 11 U.S.C. 328(c). We,

like the district court, will then review the bankruptcy court's

factual findings for clear error and its conclusions of law de

novo. In re La Roche, 969 F.2d 1299, 1301 (1st Cir. 1992).

The bankruptcy court determined that Rome improperly

represented two undisclosed "interest[s] adverse" to the CHM

chapter 11 estate Arnold Leavitt and Sandra Dickerman

resulting in actual conflicts of interest warranting Rome's

retroactive disqualification and forfeiture of all compensation

7

from the chapter 11 estate. Rome raises three principal chal-

lenges to the bankruptcy court ruling.

A. The Duty of Disclosure

First, Rome argues that retroactive disqualification

is inequitable in these circumstances, since the bankruptcy court

and the trustee tacitly endorsed his representation of Leavitt

and Dickerman, pendente lite, or, at the very least, voiced no

objection until the filing of his application for compensation in

December 1991. Given the relevant findings in this case, howev-

er, we are not swayed by Rome's resort to general notions of

equity.

Although the bankruptcy court has an affirmative duty

to exercise vigilance in avoiding impermissible conflicts of

interest on the part of court-appointed professionals, see, e.g.,

In re Anver Corp., 44 B.R. 615, 617 (Bankr. D. Mass. 1984) (once

alerted to potential conflict of interest on part of appointed

counsel, the bankruptcy court must raise the issue, sua sponte,

in order to safeguard its institutional integrity), normally the

professional, especially counsel, possesses ready access to, if

not full awareness of, the facts material to any existing or

potential competing interest which might conflict with the

interests court-appointed counsel must represent, or those which

might generate an unacceptable appearance or risk of conflict.

As with other prophylactic ethical rules constraining

attorney conduct, sections 327(a) and 328(c) cannot achieve their

purpose unless court-appointed counsel police themselves in the

8

first instance, especially in circumstances such as these, where

the nominal applicant (CHM) for Rome's appointment is a corporate

debtor in possession who can only act through its officers and

agents here Leavitt, Rome, and Dickerman and may not

command the appointee's primary loyalty. See In re Roberts, 46

B.R. at 837-39, 846 (duty of disclosure and disallowance of

compensation under 327(a) and 328(c) are designed to "prevent

'the dishonest practitioner from [engaging in] fraudulent con-

duct, and to preclude the honest practitioner from putting

himself in a position where he may be required to choose between

conflicting duties'") (citation omitted). Thus, as soon as

counsel acquires even constructive knowledge reasonably suggest-

ing an actual or potential conflict, see id. at 839 (fiduciary

duty of disclosure arises as soon as counsel becomes "aware" of

facts), a bankruptcy court ruling should be obtained. See, e.g.,

In re Martin, 817 F.2d at 182 ("There must be at a minimum full

and timely disclosure of the details of any given arrangement.

Armed with knowledge of all the relevant facts, the bankruptcy

court must determine, case by case, whether [a conflict ex-

ists].") (emphasis added); see also In re Huddleston, 120 B.R.

399, 400-01 (Bankr. E.D. Tex. 1990) ("The case law is clear that

the burden of disclosure is upon 'the person making the statement

[of qualification for employment] to come forward with facts

pertinent to eligibility and to make candid and complete disclo-

sure.' . . . '[T]his decision should not be left to counsel,

whose judgment may be clouded by the benefits of the potential

9

employment.'") (citations omitted); In re O'Connor, 52 B.R. 892,

894 (Bankr. W.D. Okla. 1985) (counsel, who disputed existence of

disqualifying conflict, requested court's "instructions on how

[to] proceed").3

Absent the spontaneous, timely and complete disclosure

required by section 327(a) and Fed. R. Bankr. P. 2014(a), court-

appointed counsel proceed at their own risk. See, e.g., In re

Roger J. Au & Son, Inc., 71 B.R. 238, 242 (Bankr. N.D. Ohio 1986)

(failure to disclose facts material to potential conflict may

provide totally independent ground for denial of fees, quite

apart from the actual representation of competing interests); In

re Thompson, 54 B.R. 311, 317 (Bankr. N.D. Ohio 1985) (same); In

re Whitman, 51 B.R. 502, 507 (Bankr. D. Mass. 1985) (same); In re

Guy Apple Masonry Contractors, Inc., 45 B.R. 160, 163 (Bankr. D.

Ariz. 1984) (same); see also In re Kendavis Indus. Int'l, Inc.,

91 B.R. 742, 748-49 (Bankr. N.D. Tex. 1988) (summarizing legisla-

tive history of 327(a) and 330, noting congressional concern

3Of course, disclosure of facts suggesting a conflict is not
invariably followed by disqualification. In special circumstanc-
es, for example, the bankruptcy court could determine, in the
sound exercise of its discretion, that any potential impairment
of its institutional integrity, or risk of divided loyalty by
counsel, was substantially outweighed by the benefits to be
derived from counsel's continued representation of multiple
entities or the impracticability of disentangling multiple
interests "without unreasonable delay and expense." In re Hoff-

man, 53 B.R. 564, 566 (Bankr. W.D. Ark. 1985). See In re O'Con-

nor, 52 B.R. at 895 (noting countervailing interest in "curtail-

ment of administrative expenses" where potential for conflict is
dormant or remote). In no event, however, may counsel presume

dispensation from the full disclosure required by 327(a) or the
sanctions authorized under 328(c). See also Fed. R. Bankr. P.

2014(a).

10

that in earlier corporate reorganization proceedings "the finan-

cial well-being of investors and the public [had been] sacrificed

to the [corporate] insiders' desire for protection and for

profit"). Thus, Rome's failure to make full and spontaneous

disclosure of the financial transactions among CHM, Leavitt, and

Leavitt's family members shortly before Rome filed the CHM

chapter 11 petition, see infra note 5 (and accompanying text);

see also Fed. R. Bankr. P. 2014(a), and to obtain explicit court

authorization to represent Dickerman, provided sufficient ground

for the discretionary denial of compensation under section

328(c).

B. The Risk Posed by Competing Interests

Second, in a bid to vindicate his failure to disclose,

Rome claims there was no potential conflict of interest since

Leavitt's and Dickerman's interests were never "adverse" to those

of the chapter 11 estate.

1. The Leavitt Interests

Rome argues that section 327(a) does not absolutely

prohibit concurrent representation of a corporate debtor in

possession and its sole shareholder, absent evidence affirma-

tively demonstrating an "actual" as distinguished from a

"potential" conflict of interest. Moreover, there could have

been no "actual" conflict, he suggests, because: (1) between

December 1989 and May 1990, Rome did not represent Leavitt; (2)

between May 1990, when the involuntary chapter 7 petition was

11

filed against Leavitt, and August 1990, when Braunstein was

appointed the CHM chapter 11 trustee, it was not Rome but the

chapter 7 trustee who represented the Leavitt chapter 7 estate;

and (3) none of the transfers from CHM to Leavitt prior to CHM's

chapter 11 petition have yet been proven improper, preferential

or fraudulent. These arguments are specious.

The fact that Rome did not represent Leavitt until May

1990 is immaterial, since section 328(c) expressly empowers the

bankruptcy court to disallow compensation if court-appointed

counsel, "at any time," is either not a "disinterested" person

"or represents or holds an interest adverse to the interest of

the estate with respect to the matter on which [counsel] is

employed." Bankruptcy Code 328(c), 11 U.S.C. 328(c). Rome's

post-May 1990 representation of chapter 7 debtor Leavitt, against

whom the CHM chapter 11 estate also represented by Rome

held claims for the avoidance of alleged preferential and fraudu-

lent transfers, created a clear conflict of interest without

regard to whether the Leavitt chapter 7 estate itself was repre-

sented by a trustee in bankruptcy. After all, Rome sought

compensation for services rendered to the CHM chapter 11 estate,

not to Leavitt, the chapter 7 debtor. Cf. In re Hoffman, 53 B.R.

564, 565 (Bankr. W.D. Ark. 1985) ( 327(a) is inapplicable to

appointment or compensation of counsel to chapter 7 debtor). Yet

Rome's representation of Leavitt in the involuntary chapter 7

proceeding plainly undermined confidence in Rome's ability to

provide impartial advice to the CHM estate relating to the

12

prospects for recovering the alleged prepetition transfers to

Leavitt and Leavitt family members.

As concerns Rome's third contention that no trans-

fers from CHM to Leavitt prior to CHM's chapter 11 petition have

yet been proven improper, preferential or fraudulent we are

bound by the bankruptcy court's factual findings unless clearly

erroneous. See In re La Roche, 969 F.2d at 1301; In re Martin,

817 F.2d at 182-83 (noting that "[t]he bankruptcy judge is on the

front line, in the best position to gauge the ongoing interplay

of [ 327(a)] factors and to make the delicate judgment calls

which such a decision entails"); In re Huddleston, 120 B.R at

402-03 (favoring case-by-case analysis). And since section

327(a) is designed to limit even appearances of impropriety to

the extent reasonably practicable, doubt as to whether a particu-

lar set of facts gives rise to a disqualifying conflict of

interest normally should be resolved in favor of disqualifica-

tion. Cf. In re Freedom Solar Ctr., Inc., 776 F.2d 14, 17 (1st

Cir. 1985).4

Even if we were to set to one side Rome's unexplained

failure at the outset to apprise the bankruptcy court of facts

that might generate an appearance of impropriety, the bankruptcy

court's section 328(c) ruling is well supported by the record.

4Although In re Freedom Solar involved an application of the

Maine Bar Rules in a bankruptcy proceeding, we cite to it throug-
hout this opinion in contexts legitimately informed by its
closely analogous discussion. See, e.g., In re Kendavis, 91 B.R.

at 752 ("The Bankruptcy Code provisions dealing with conflicts of
interest find their counterparts in the ABA Code of Professional
Responsibility."); In re Roberts, 46 B.R. at 829-37 (same).

13

As the bankruptcy court was informed at the hearing on the fee

applications, see supra at p. 4, CHM creditors had commissioned

the Peterson Report, a pre-chapter 11 investigation into CHM's

financial condition, which disclosed that Arnold Leavitt had

caused large prepetition transfers from the CHM treasury to

himself and immediate family members.5 In addition, Rome had

shown considerable intransigence to efforts by Peterson to obtain

access to certain CHM records, even informing Peterson that

access must await "litigation" and "discovery." See In re

Martin, 817 F.2d at 182 (noting relevance of "adverse" interests

which threaten "to hinder or to delay the effectuation of a

[reorganization] plan"); cf. In re Freedom Solar, 776 F.2d at 16

(noting shareholder interest "in delaying the turnover of the

assets [in order] to use his possession of them as a negotiating

chip, while the debtor's interest was in cooperating with the

trustee to achieve the swiftest resolution possible"); In re

Kendavis, 91 B.R. at 750-51 (describing counsel's resort to

dilatory "scorched earth" tactics in behalf of insiders "adverse"

to debtor). Coupled with the preferential "insider" terms

proposed in the three CHM chapter 11 reorganization plans Rome

presented to CHM creditors, his continued participation promoted

5Appellee Braunstein, the CHM chapter 7 trustee, represented
to the bankruptcy court that he had objected to Leavitt's chapter
7 discharge, and was preparing to initiate an adversary proceed-
ing against Leavitt's wife and son to recover an automobile
allegedly transferred to Leavitt by CHM a few months before Rome
filed the chapter 11 petition in behalf of CHM. Cf. In re

Freedom Solar, 776 F.2d at 17 (potential adverse interest looms

where shareholder of corporate debtor may have received preferen-
tial transfer).

14

the readily foreseeable perception that he was attempting to

insulate Leavitt's personal and family financial interests at the

expense of the CHM chapter 11 estate and its creditors. See id.

at 750 (internal corporate communication suggested that attorneys

improperly represented family controlling debtor corporation, and

not their client of record the debtor); In re Hoffman, 53 B.R.

at 565 (first loyalty of corporate debtor's counsel must lie with

corporation, not with its individual officers).

2. The Dickerman Interests

Rome argues, in a similar vein, that after Braunstein's

appointment as the CHM chapter 11 trustee in August 1990,

Braunstein alone represented CHM's interests. Thus, as a matter

of law, there could have been no disqualifying "conflict of

interest" in Rome's concurrent representation of Dickerman in her

successful purchase of CHM's assets. Moreover, even as a factual

matter, he argues, there could have been no actual conflict

because Dickerman was the only bidder and the sale benefited both

buyer and seller.

As with other arguments insistently advanced by Rome,

this one presupposes that there can be no disqualifying conflict

absent proof of actual loss or injury. On the contrary, simulta-

neous representation of the buyer and the seller in the same

transaction is a prototypical disqualifying conflict of interest

even if it is not invariably disqualifying in all circumstances.

See In re Tidewater Memorial Hosp., Inc., 110 B.R. 221, 228-29

(Bankr. E.D. Va. 1989) ("[D]ouble representation [in acquisition

15

of debtor's assets] can be allowed, if at all, only under the

strictest adherence to the statute and regulations," including

full disclosure.). Even if Dickerman was the highest bidder for

these CHM assets, or even the only one, Rome's longtime position

as corporate clerk and counsel to CHM, both prepetition and

postpetition, presumably afforded him unique access to inside

information concerning the nature and value of its assets,

information that Rome could have used (or been tempted to use) to

enable his other client Dickerman to submit a better

calibrated bid than arm's-length bidders could venture, thereby

potentially chilling bidding at the expense of CHM and its

creditors. Cf. In re Freedom Solar, 776 F.2d at 16 (corporate

debtor's shareholder had legitimate interest in buying assets at

lowest possible price; debtor in selling at highest price).

Furthermore, counsel to a chapter 11 debtor owes continuing

loyalty to the debtor throughout the chapter 11 proceedings;

appointment of a chapter 11 trustee does not end counsel's

obligation to the debtor entity. See id. at 18 (noting that

"[f]ederal law imposes enduring duties on the debtor . . . [and]

[i]n these situations, the debtor needs real representation and

advice"; ethical rules are designed "to avoid the possibility

that [the attorney] will succumb to temptation and give tainted

advice"). In our considered view, therefore, Rome's unauthorized

representation of Dickerman generated a palpable appearance and

risk of divided loyalties, see In re Thompson, 54 B.R. at 316,

16

placing the CHM estate at "more than acceptable risk," In re

Martin, 817 F.2d at 180.

C. Severity of Sanction

Finally, Rome argues, even if the bankruptcy court

supportably determined that he represented "adverse" interests

that should have been disclosed ab initio, the most it should

have done is reduce his compensation since there is no evidence

that any conflict of interest, however suspect in appearance,

actually harmed the chapter 11 estate or its creditors, and the

trustee concedes that Rome provided "valuable services" to the

estate.6

An attorney retained pursuant to section 327(a) assumes

a fiduciary responsibility to refrain from rendering any unautho-

rized service in furtherance of an interest adverse to the client

he serves by court appointment. See In re Kendavis, 91 B.R. at

753 (citing Wolf v. Weinstein, 372 U.S. 633, 641 (1963)). "A

fiduciary . . . may not perfect his claim to compensation by

insisting that, although he had conflicting interests, he served

his several masters equally well or that his primary loyalty was

not weakened by the pull of his secondary one." Woods v. City

Nat'l Bank & Trust Co., 312 U.S. 262, 269 (1941); In re Roger J.

6We need not address Rome's argument that it was inequitable
to allow the Braunstein and R & B fee applications in full, yet
disallow Rome's application in full. Rome informed the bankrupt-
cy court that he was "not opposed" to the Braunstein and R & B
fee applications. Hence, the reasonableness of the former
ruling is an issue which has been waived. See Mark Bell Furni-

ture Warehouse, Inc. v. D.M. Reid Assocs., Ltd. (In re Mark Bell

Furniture Warehouse, Inc.), 992 F.2d 7, 9 (1st Cir. 1993).

17

Au, 71 B.R. at 241. Especially where there has been a clear

failure to make timely and spontaneous disclosure of all facts

material to a disqualifying conflict of interest, counsel ap-

pointed pursuant to section 327(a) can lay no claim of right to a

lesser sanction than the bankruptcy court is authorized to impose

pursuant to section 328(c).

Like other courts which have considered the issue,

however, we adopt no per se or brightline rule invariably

requiring denial of all compensation under section 328(c).7

Nevertheless, based on its familiarity with the CHM proceedings,

the bankruptcy court in this case acted well within its discre-

tion in finding that Rome's services "produced virtually no

benefit." See, e.g., Bankruptcy Code 330(a)(1), 11 U.S.C.

330(a)(1) (compensation may be based on assessment of "the

value of such services"); In re Kendavis, 91 B.R. at 762 (reduc-

ing fees by 50% for conflict of interest, but citing "exceptional

circumstances"); In re Whitman, 51 B.R. at 506 (noting that

"results obtained" are relevant consideration). Furthermore,

where court-appointed counsel has served under an undisclosed

7See, e.g., In re Kendavis, 91 B.R. at 762 (general rule

favors total denial of compensation, but equities may allow
lesser sanction as facts warrant); In re Roger J. Au, 71 B.R. at

242-43 (since 328(c) says "may deny," the bankruptcy court
retains discretion to depart from general rule of total denial,
where equities demand); In re GHR Energy Corp., 60 B.R. 52, 68

(Bankr. S.D. Tex. 1985) (penalty for 327(a) conflict may be
adjusted to reflect gravity of breach); In re Roberts, 46 B.R. at

846-48, 850 (same, noting that bankruptcy court is court of
equity). But cf. In re Chou-Chen Chems., Inc., 31 B.R. 842, 850-

51 (Bankr. W.D. Ky. 1983) (favoring denial of all compensation if
conflict exists, regardless of benefit from services rendered).

18

disqualifying conflict of interest, the bankruptcy court cannot

always assess with precision the effect the conflict may have had

either on the results achieved or the results that might have

been achieved by following "the road not taken." See Woods, 312

U.S. at 269 ("[T]he incidence of a particular conflict of inter-

est can seldom be measured with any degree of certainty [and

[t]he bankruptcy court need not speculate as to [] the result of

the conflict . . . ."); In re Tidewater, 110 B.R. at 229 (denying

compensation even though there was "[n]o doubt the law firm

performed valuable services in the chapter 11 case").8 Yet as

an appellate court, we are poorly positioned to second-guess a

bankruptcy court's judgment call in these circumstances, and

neither we nor the district court have been shown any reason for

doing so in the present case.

The district court judgment is affirmed.
The district court judgment is affirmed.

8For example, the bankruptcy court observed that Rome's role
as counsel to CHM, qua debtor in possession, generated vigorous

opposition to all three reorganization plans, as well as unusual-
ly intense antagonism from CHM's general creditors (including
Rome's longtime law partner). The clear implication, unverifi-
able in hindsight, is that CHM's reorganization prospects may
have been better but for Rome's insistence on serving three
clients simultaneously in these proceedings. In re Kendavis, 91

B.R. at 748 ("[E]thical violations or conflicts of interest may
lessen the value of services. If an attorney holds an undis-
closed adverse interest, a court is empowered to deny all compen-
sation.") (citation omitted); In re Whitman, 51 B.R. at 507

(same). Retrospective damage assessments are made all the more
difficult where counsel has labored under several simultaneous
conflicts of interest.

19