In re Joseph R. SOLFANELLI and Natalie G. Solfanelli, Debtors.

Joseph R. Solfanelli and Natalie G. Solfanelli, Plaintiffs,

v.

Meridian Bank, Defendant.

No. 3:97–CV–160.

United States District Court, M.D. Pennsylvania, Scranton Division.

Jan. 22, 1999.

See also 221 B.R. 141.

Edward Mannino, Philadelphia, PA, for Joseph Solfanelli.

John Doran, Wilkes–Barre, PA, for Natalie Solfanelli.

Joan Sheak, Philadelphia, PA, Morton Branzburg, Philadelphia, PA, for defendant.

### MEMORANDUM

VANASKIE, District Judge.

Pending before this Court are consolidated appeals from three bankruptcy court orders entered in connection with a Chapter 11 bankruptcy case instituted on behalf of debtors Joseph R. and Natalie G. Solfanelli. The principal issue presented by the parties is whether the Solfanellis' secured creditor, Meridian Bank ("Meridian"), is barred from pursuing a deficiency claim against the Solfanellis as a result of its conduct in connection with its disposition of the primary collateral securing the Solfanellis' debt—approximately 200,000 shares of common stock in First Eastern Bank ("FEB"). The bankruptcy court concluded that Meridian's handling of a claim against Keefe, Bruyette, and Woods ("KB & W"), the broker retained by Meridian to sell the FEB stock, which claim was based upon KB & W's undisclosed purchase of the major portion of the FEB stock and resale of that stock two days later at a substantial profit, was commercially unreasonable, and that Meridian had failed to rebut the resulting presumption that the value of this collateral equaled the indebtedness. Meridian challenges this decision, arguing that the Solfanellis had no cognizable interest in the KB & W settlement. The Solfanellis, in their cross appeal, argue that their indebtedness to Meridian should be deemed satisfied on the alternative grounds that (a) Meridian effectively elected foreclosure on the FEB stock in lieu of a sale and deficiency claim; and (b) the delay in selling the

stock was, in and of itself, commercially unreasonable. Having carefully reviewed the record and applicable case law, I find that the Solfanellis' arguments on the latter of those two arguments to be meritorious. I also find that the bankruptcy court did not err in finding that Meridian acted in a commercially unreasonable manner in first negotiating a resolution of its claim against KB & W without notifying the Solfanellis, and then attempting to cover up the transaction. Because Meridian did not rebut the presumption that the value of the collateral equaled the amount of indebtedness, the bankruptcy court's determination that the Solfanellis' obligation to Meridian must be deemed extinguished will be affirmed.[1]

Also at issue in these appeals is whether Meridian violated the Bankruptcy Code's automatic stay in garnishing accounts containing post-petition funds. Meridian contends that it was entitled to garnish the accounts in question by virtue of the parties' Stipulation and Security Agreement, approved by the bankruptcy court in January of 1991, which provided Meridian with relief from the automatic stay upon the filing of a Certificate of Default, which was accomplished on March 18, 1991, approximately 11 months before the accounts in question were garnished. Because the parties' agreement did not authorize the attachment of post-petition funds, the bankruptcy court's finding of a violation of the automatic stay will be affirmed. Moreover, the award of punitive damages in the amount of $10,000 for the violation of the automatic stay is neither inconsistent with the law nor unreasonable.[2]

Finally, Meridian has challenged two bankruptcy court orders dated October 27, 1997, which authorized payment of attorneys' fees and expenses from the proceeds of the settlement of litigation brought on behalf of Joseph R. Solfanelli against FEB and several of its officers (the "state court litigations"), and payment of certain federal taxes. Because I find no error or abuse of discretion in connection with these disbursements, the bankruptcy court orders will be affirmed.

## I. BACKGROUND

On September 8, 1989, the Solfanellis, along with Carmine B. Tomaine, executed a promissory note in favor of Meridian in the amount of $4,900,000. The primary collateral for this indebtedness was more than 200,000 shares of FEB common stock owned by Joseph Solfanelli.[3]

On October 10, 1990, Meridian confessed judgment against the Solfanellis and Mr. Tomaine, jointly and severally, in the amount of $5,448,677.01.[4] In connection with the entry of judgment, Meridian caused the Solfanellis' accounts at FEB and Penn Security Bank to be attached.

On October 12, 1990, the Solfanellis filed a joint Chapter 11 bankruptcy petition. Meridian moved for relief from the Bankruptcy Code's automatic stay. A hearing on the motion was scheduled for December 14, 1990.

---

1. The bankruptcy court order calls for entry of judgment in favor of Joseph R. Solfanelli with respect to the indebtedness to Meridian, decreeing that "[t]he obligation of Joseph R. Solfanelli to Meridian Bank is hereby deemed satisfied." Natalie Solfanelli has cross-appealed from the failure of the bankruptcy court order to decree judgment in her favor with respect to this issue. The judgment in favor of Joseph Solfanelli was based upon an unrebutted presumption that the value of the FEB stock equaled the Solfanellis' indebtedness to the Bank. It necessarily follows that judgment should have been entered in favor of Natalie Solfanelli as well. Accordingly, the matter will be remanded to the bankruptcy court with directions to enter judgment in favor of Natalie Solfanelli on Count VII of the amended complaint filed on behalf of the Solfanellis against Meridian.

2. Natalie Solfanelli contends that the improper garnishment of post-petition funds and Meridi-

an's refusal to withdraw its judgment against her voids her release of Meridian executed in connection with the Stipulation and Security Agreement. Because, however, the Stipulation and Security Agreement specifically provided that Natalie Solfanelli's release was to "retain its full force and effect, regardless of what transpires in the future between Debtors and Bank," her request to rescind her release is without merit.

3. It appears that Mr. Tomaine also owned a substantial amount of FEB stock that was pledged as collateral for this indebtedness.

4. The amount of the judgment consisted of principal of $4,681,774.87, interest, costs and expenses of $55,683.40, and an "Attorneys' Collection Fee" of $710,618.74. (See Defendant's Exhibit ("DX") 31.)

Prior to the hearing, the parties reached an agreement that was reduced to a writing, signed by the parties, and filed with the bankruptcy court on December 27, 1990.

The Stipulation and Security Agreement (DX–40) authorized the Solfanellis "to use Cash Collateral in the ordinary course of their businesses and for ordinary and customary living expenses, subject to the terms and conditions of this Stipulation."[5] The Stipulation and Security Agreement required, *inter alia*, that the Solfanellis make monthly interest payments to Meridian and that Joseph Solfanelli sell his limited partnership interest in BBB Cellular Partners on or before March 15, 1991 for an amount yielding net proceeds of at least $300,000, which were to be paid to Meridian. The Solfanellis also agreed to execute a General and Joint Tortfeasor Release in favor of Meridian Bank, with the release "retain[ing] its full force and effect, regardless of what transpires in the future between Debtors and Bank. . . ." Among the events of default specified in the Stipulation and Security Agreement was the Solfanellis failure to make the required payments when due. As to Meridian's rights upon default, the Stipulation and Security Agreement provided:

> Upon the occurrence of any Event of Default and immediately upon the filing of a Certificate of Default certifying such Event with the Bankruptcy court, Bank shall be entitled without further notice to relief from the automatic stay of Section 362 and shall be allowed to proceed with the exercise of all remedies available to it in respect of the Existing Indebtedness and Collateral,[6] and to that end the Order approving this Stipulation shall have the effect of a Final Order under Section 362 of the Bankruptcy Code terminating, upon the filing of such Certificate of Default, the

automatic stay of lien, collection, and enforcement arising out of the filing by Debtors of this Chapter 11 proceeding as well as any other stay contained in any other Order of Court.

The Stipulation and Security Agreement was approved by the bankruptcy court by Order dated January 22, 1991.

On March 18, 1991, Meridian filed a Certificate of Default based upon the Solfanellis' failure to make the February and March interest payments and Joseph Solfanelli's failure to sell his limited partnership interest in BBB Cellular Partners prior to March 15, 1991. (DX–41.) The Certificate of Default stated that "Meridian Bank is entitled without further notice to relief from the automatic stay of Section 362." In a letter transmitting the Certificate of Default to the Solfanellis and their attorney, Meridian's counsel stated:

> Please be advised . . . that Meridian Bank has agreed, in its sole discretion . . . to forebear from taking any further action until 2 p.m. on Friday, March 22, 1991. If Joe Solfanelli has not sold his interest in the Cellular Company and paid $300,000 to Meridian Bank by 2 p.m. on Friday, March 22, 1991, Meridian Bank will no longer refrain from taking further action. [Plaintiff's Exhibit ("PX")—78.]

Sale of Joseph Solfanelli's interest in BBB Cellular was consummated by March 22, 1991, and a payment of $300,000 was made to Meridian. Nonetheless, Meridian, in a letter from its counsel dated March 28, 1991, informed the Solfanellis that the automatic stay remained terminated. The March 28, 1991 letter asserted:

> Please be aware that the Certificate of Default filed by Meridian Bank on Monday, March 18, 1991 remains in full force and effect and the automatic stay was and

---

**5.** "Cash Collateral" was expressly defined in the Stipulation and Security Agreement to "have the meaning set forth in Section 363(a) of the Bankruptcy Code." In 1991, § 363(a) provided:

'[C]ash collateral' means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property subject to a securi-

ty interest as provided in Section 552(b) of this title, whether existing before or after the commencement of a case under this title.

**6.** The term Collateral was defined to mean the FEB common stock owned by Joseph Solfanelli, the Solfanellis' residence, a condominium property owned by Joseph Solfanelli in Pike County, Pennsylvania, and the Solfanellis' anticipated tax refunds.

remains terminated as to Meridian Bank. Our letter of March 18, 1991 provided that Meridian Bank would forebear from proceeding until 2 p.m. on Friday, March 22, 1991, unless Meridian Bank received $300,000 on Friday, March 22, 1991. Although Meridian Bank received the payment, the event of default remains. [DX–42.]

The Solfanellis did not take any action in the bankruptcy court to challenge Meridian's position.

As a consequence of the filing of the Certificate of Default, Meridian considered itself to be the sole owner of the FEB stock in question, with unfettered discretion concerning its disposition. From the filing of the Certificate of Default on March 18, 1991 until late January, 1992, Meridian did not take any action to sell the FEB stock and apply the proceeds therefrom against the indebtedness. In February of 1991, Meridian had requested Joseph Solfanelli to sell his FEB stock in order to retire the debt. At that time, the stock was selling at $16.00. (1/9/95 Notes of Testimony (N.T.) at 104–05; 1/11/95 N.T. at 58, 124–27.)[7] From March 18, 1991 through at least September of 1991, FEB stock traded at or above $16, an amount that Meridian had conceded was adequate to cover the indebtedness. In August of 1991, Meridian performed an analysis of FEB stock that was essentially negative. Notwithstanding this negative analysis, FEB stock traded at prices between $17.25 and $17.75 on September 3, 4 and 5, 1991. At that time, however, Meridian did not have any plan in place for the sale of FEB stock.

By October of 1991, the price of FEB shares had fallen below a "floor" established in the Stipulation and Security Agreement, thus constituting another Event of Default. By letter dated October 25, 1991, Meridian's counsel informed the Solfanellis' attorney of this fact. (DX–50.)

In January of 1992, Meridian elected to sell the FEB shares that had been pledged by Joseph Solfanelli and the FEB shares pledged by Mr. Tomaine.[8] To effect the sale,

Meridian retained KB & W, a registered broker considered to be an expert in bank stocks. In a letter dated January 27, 1992, Joseph Solfanelli acknowledged being informed that Meridian had decided to sell the FEB stock, and requested "that the sale of these securities be conducted in a commercially reasonable manner." (DX–56.) No action was taken by Mr. Solfanelli, however, to prevent the sale.

On February 6, 1992, KB & W sold 30,000 shares of FEB stock at $12.25, which was $.50 above the NASDAQ bid price on that day. On February 10, 1992, KB & W sold 10,000 shares at $10.50, which was the NASDAQ bid price on that day. On February 12, 1992, an additional 10,000 shares was sold at $10.25, which was the bid price on that day. KB & W then sought FEB's permission to sell the balance of 163,199 shares to a single buyer at $10.25. Meridian approved this disposition on February 18, 1992. Unknown to Meridian, however, it was KB & W who purchased the majority of the stock in question. Just two days later, FEB stock closed at $13.00, with approximately 183,000 shares traded.

In light of the sudden rise in the price of FEB shares and the large block traded on February 20, 1992, Meridian undertook an investigation of its broker's disposition of the FEB stock. Meridian learned that KB & W itself had purchased the block of shares on February 18th and then sold or "flipped" the stock on February 20th, making a substantial but undetermined profit. A handwritten memorandum dated February 27, 1992, and marked as "Joint Trial Exhibit," plainly reveals that Meridian was not satisfied with the explanations of its broker and that it appeared that KB & W had "benefitted $500,000 at Meridian's expense by buying and reselling FEB stock over a two-day period of time." On a telecopier cover sheet, Meridian's Russ Kunkel observed that "I think you can easily see why we feel we were not properly handled by [KB & W] and have escalated the problem to senior management on both sides." As a result of ensuing nego-

---

7. Solfanelli, who was not in default at the time, refused the request, and Meridian had no authority to compel a sale.

8. Mr. Tomaine had pledged 37,934 shares of FEB stock. (DX–56.)

tiations, KB & W paid Meridian $150,000, which Meridian then applied against the loan balance. Meridian agreed to indemnify KB & W in connection with any claim made against KB & W related to the sale of the shares in question. (PX–22.)

Joseph Solfanelli was not informed of KB & W's self-dealing. Nor was he told of the assertion of a claim on behalf of Meridian against KB & W, the ensuing negotiations and settlement. Indeed, in response to Mr. Solfanelli's request for an accounting of the proceeds of the sales of the shares, Meridian described the $150,000 payment from KB & W as "proceeds from sale of additional First Eastern stock." (DX–77.) [9]

On February 10, 1992, at the same time it was selling Joseph Solfanelli's stock, Meridian garnished various accounts of the Solfanellis at FEB and at Penn Security Bank. The accounts in question included post-petition funds of the Solfanellis.

On February 27, 1992, the Solfanellis commenced an adversary proceeding against Meridian. On March 24, 1992, the Solfanellis filed an amended complaint containing the following counts:

● Count I—violation of the automatic stay in connection with the garnishment of accounts containing post-petition funds

● Count II—abuse of process in connection with the garnishment of the accounts

● Count III—request for punitive damages in connection with the violation of the stay

● Count IV—rescission of the release executed in favor of Meridian as part of the Stipulation and Security Agreement based upon Meridian's alleged breach of that agreement

● Count V—rescission of the release based upon fraud and misrepresentation occurring prior to execution of the Stipulation and Security Agreement

● Count VI—civil conspiracy based upon the contention that Meridian conspired with FEB to administer the Solfanelli loan in a commercially unreasonable manner in order to pressure Mr. Solfanelli to refrain from seeking a sale or merger of FEB

● Count VII—violation of § 9504 of the Uniform Commercial Code and Rule 10b–5 of the Securities Exchange Act of 1934 based upon the disposition of the FEB shares in February of 1992.

On July 5, 1994, the bankruptcy court bifurcated the trial into two phases, with the first phase concerning Counts I through IV and VII.[10] The first phase of the trial was conducted in 1995. In an opinion dated December 13, 1996, the bankruptcy court found that Meridian had violated the automatic stay and committed abuse of process in connection with the garnishment of accounts containing post-petition funds.[11] While finding that Natalie Solfanelli had suffered embarrassment, humiliation and mental anguish as a result of the improper garnishment, the bankruptcy court awarded only nominal damages of $1.00. Finding that the criteria for award of punitive damages had been satisfied, however, the court awarded Natalie Solfanelli $10,000 in exemplary damages. As to the request to void the release, the bankruptcy court found that while Meridian had breached the Stipulation and Security Agreement by not releasing Natalie Solfanelli from its judgment and by its garnishment of post-petition funds, the proviso in the Stipulation and Security Agreement that the Release retained its full force and effect regardless of what transpired in the future between the Solfanellis and Meridian manifested an unequivocal intention on the part of the Solfanellis to release Meridian independent of Meridian's performance of its obligations under the Stipulation and Security Agreement. As to Count VII, the bankruptcy court found that the failure of Joseph Solfanelli to request a sale of the pledged securities fore-

---

9. The accounting also described payments of approximately $455,000 made by Mr. Tomaine as well as receipt of approximately $450,000 from the sale of miscellaneous other stock that Mr. Tomaine had apparently pledged as collateral for the indebtedness.

10. Joseph Solfanelli had waived his claims for damages on Counts I through IV of the Amended Complaint.

11. The bankruptcy court's ruling is reported at 206 B.R. 699 (Bankr.M.D.Pa.1996).

closed any claim based upon the timeliness of the sale, but that Meridian's handling of the claim against KB & W, which was found to be an integral aspect of the disposition of the collateral, was commercially unreasonable. This holding triggered a presumption that the value of the collateral equaled the amount of the indebtedness. *See Savoy v. Beneficial Consumer Discount Co.*, 503 Pa. 74, 78, 468 A.2d 465, 467 (1983). In determining that Meridian had not rebutted this presumption, the Bankruptcy court explained:

> While Meridian offered no direct evidence that the settlement with Keefe, Bruyette, and Woods was a reasonable one, I cannot ignore the fact that I have considered the Bank's actions up to the point of negotiating with Keefe, Bruyette, and Woods as being commercially sound. The failure of the Bank existed in the refusal to disclose their suspicions of improprieties to the equitable owner of the stock, Joseph Solfanelli, their neglect in declining to include Solfanelli in their settlement discussions, and their subterfuge in trying to hide this event from the Debtors. *While I can speculate what the stock may have sold for during this time period, I have been given no evidence whatsoever of the scope of potential damages—compensatory, consequential, or punitive—that the Plaintiffs may have against Keefe, Bruyette, and Woods.* I therefore conclude that the commercially unreasonable manner in which the claim was resolved will require my finding that the stock value equals the indebtedness. 206 B.R. at 712 [emphasis added].

As to the securities fraud claim, the Bankruptcy court concluded that the Solfanellis had not shown how they relied upon any alleged misrepresentations in connection with the disposition of the stock, including the misrepresentations made in connection with the settlement of the claim against KB & W, or how they suffered any economic loss as a result thereof. Consistent with its conclusions, the Bankruptcy court entered judgment in favor of Natalie Solfanelli and against Meridian on Counts I through III of the Amended Complaint, in favor of Meridian and against Natalie Solfanelli on Count IV, and in favor of Joseph Solfanelli and against Meridian on Count VII.

Meridian moved for leave to appeal the interlocutory order. The Solfanellis, while opposing Meridian's motion, moved to cross-appeal on Counts IV and VII "to the extent such judgments are adverse to plaintiffs...."[12]

While the motions for leave to appeal were pending before this Court, the bankruptcy court, in separate orders dated October 27, 1997, approved disbursement of $315,000 in fees and approximately $27,000 in expenses to Attorney Edward F. Mannino for his representation of Joseph Solfanelli in connection with the state court litigations, which had settled for the sum of $1,500,000, and a disbursement of $67,549.33 (plus interest and penalties) to satisfy a federal tax liability for the period ending December 31, 1994. Both disbursements were made from the proceeds of the settlement of the state court litigations, which the bankruptcy court had approved on December 10, 1996. Meridian, *contending that the disbursements imperil its ability to collect in the event it prevails on its challenges to the extinguishment of the Solfanelli indebtedness, has appealed both orders.*[13]

By Memorandum and Order filed on February 11, 1998, the parties were granted

---

12. As noted above, Natalie Solfanelli argues that judgment on Count VII should be entered in her favor, as well as her husband's. Meridian has moved to have sanctions imposed against Natalie Solfanelli's lawyer, contending that the cross-appeal did not encompass her claim that the judgment on Count VII should be amended to include her. Because the motion for leave to cross-appeal applied to the extent the judgments were adverse to her, and the failure to enter judgment in her favor was plainly adverse to her, Meridian's motion for sanctions is meritless.

13. Meridian also challenged the October 27, 1997 orders to the extent they authorized the Solfanelli's, as debtors-in-possession, to use the proceeds of the settlement of the state court litigations. In November of 1997, however, the bankruptcy court enjoined the Solfanellis from spending these funds. Moreover, by Order dated February 17, 1998, the bankruptcy court denied the Solfanellis' request for access to the settlement proceeds.

leave to appeal the bankruptcy court's Order of December 10, 1996, disposing of Counts I through IV and VII of the Amended Complaint. The February 11th Order also consolidated the appeal and cross-appeal from the December 10, 1996 Order with Meridian's appeals of the orders allowing disbursements from the settlement of the state court litigations. Following submissions of briefs, oral argument was heard on May 28, 1998.[14]

## II. DISCUSSION

### A. *Meridian's Disposition of the FEB Stock*

■■■ Meridian maintains that upon the filing of the Certificate of Default on March 18, 1991, it had the right to exercise the remedies available to a secured creditor, the automatic stay having been effectively lifted. Article 9 of the Uniform Commercial Code, adopted in Pennsylvania at 13 Pa.Cons.Stat. Ann. §§ 9101, *et seq.*, affords a secured creditor in the possession of the collateral, such as Meridian, a choice of remedies. The secured creditor may either accept the collateral in discharge of the debtor's obligation or sell the collateral and apply the proceeds of the sale toward satisfaction of the debt. *Chrysler Credit Corp. v. B.J.M., Jr., Inc.*, 834 F.Supp. 813, 832 (E.D.Pa.1993), *aff'd mem.*, 30 F.3d 1485 (3d Cir.1994). Pursuant to the "disposition" option set forth in 13 Pa.Cons.

Stat.Ann. § 9504, the secured creditor must act in a "commercially reasonable manner in every aspect related to the sale of collateral." [15] *See In re LaRoche*, 969 F.2d 1299, 1302–03 (1st Cir.1992). "If the proceeds from any such disposition of the collateral are less than the amount due on the secured indebtedness, the secured creditor may attempt to recover the deficiency." *Id.* at 1303.

■■■ The secured party's second option is to "retain the collateral in satisfaction of the obligation." 13 Pa.Cons.Stat.Ann. § 9505(b). This second option, sometimes referred to as the "retention" or "strict foreclosure" remedy, normally completely satisfies the debt. "The secured party must abandon any claim for deficiency (unless the debtor signs a written statement permitting such a claim. . . .)" *Lamp Fair, Inc. v. Perez–Ortiz*, 888 F.2d 173, 176 (1st Cir.1989). As a condition of electing this option, however, "the secured party must give notice of its intention to retain the collateral in satisfaction of the obligation, so that the debtor may object to retention and demand that the collateral be sold." *Id.*[16]

In seeking a decree that their indebtedness to Meridian should be deemed satisfied, the Solfanellis presented several theories: (1) Meridian should be deemed to have elected

14. In an opinion dated March 6, 1998, the bankruptcy court ruled in favor of Meridian on Counts V and VI of the Amended Complaint. *In re Solfanelli*, 221 B.R. 141 (Bankr.M.D.Pa.1998). Essentially, the bankruptcy court found that the Solfanellis had failed to establish fraudulent conduct on the part of Meridian sufficient to void the release executed in connection with the Stipulation and Security Agreement and had not proven that Meridian engaged in a civil conspiracy with FEB to administer the Solfanelli loan in a commercially unreasonable manner for purposes of pressuring Mr. Solfanelli to discontinue his efforts to seek a sale or merger of FEB. The Solfanellis have not appealed these determinations, and they are thus not before me at this time.

15. In pertinent part, § 9504(c) provides:
Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type custom-

arily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale.

16. In pertinent part, § 9505(b) provides:
[A] secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor if he has not signed, after default, a statement renouncing or modifying his rights under this subsection. . . . If the secured party receives objection in writing from a person entitled to receive notification within 21 days after the notice was sent, the secured party must dispose of the collateral under section 9504. In the absence of such written objection the secured party may retain the collateral in satisfaction of the obligation of the debtor.

strict foreclosure; (2) Meridian's 11–month delay in selling the stock was commercially unreasonable; and (3) Meridian's handling of the claim against KB & W was commercially unreasonable. The bankruptcy court did not address the first theory, rejected the second, and sustained the third. Meridian appealed the decision adverse to it, and the Solfanellis urge affirmance on any of the theories it advanced. The arguments presented by the Solfanellis will be addressed *seriatim*.

## 1. The "Strict Foreclosure" Theory

Meridian did not given written notice to Joseph Solfanelli of a proposal to retain the FEB stock in satisfaction of the Solfanelli indebtedness. The Solfanellis argue, however, that Meridian's claim of full and absolute ownership of the FEB stock, its assertion that its discretion concerning the disposition of the stock was unfettered, and its delay of almost 11 months in selling the shares require the implication of an election of the strict foreclosure remedy.

It does not appear that any court in Pennsylvania has definitively addressed the question of whether there may be an implied election of strict foreclosure. A number of other jurisdictions, however have embraced such a rule. *See, e.g., Lamp Fair*, 888 F.2d at 176 ("[T]he majority of courts that have dealt with this issue would simply hold that Lamp Fair's conduct in retaining and operating the store on a permanent basis brings the transaction with in the scope of the § 9505(2) 'retention option' irrespective of whether or not Lamp Fair chose to invoke this option."); *Banker v. Upper Valley Refrigeration Co.*, 771 F.Supp. 6, 8–9 (D.N.H.1991) ("[A majority of jurisdictions reason] that the Code intends 'to put the creditor to an election either to sell the repossessed collateral pursuant to § 9.504 or to retain the collateral in complete satisfaction of the debt pursuant to § 9.505.' "). One court has observed that "[u]nder the 'implied election' theory, the absence of written notice of election by the secured creditor would not bar the debtor's recourse to U.C.C. § 9–505(2) as a defense to payment of the debt if the secured creditor (1) failed to dispose of the collateral within a 'reasonable' time after default (e.g. pursuant

to an election under § 9504), or (2) engaged in other conduct, e.g., interim use of collateral, that indicates an intent to retain the collateral and waive any deficiency." *LaRoche*, 969 F.2d at 1303; *see also Millican v. Turner*, 503 So.2d 289, 291–92 (Miss.1987) ("[W]hen a creditor who has repossessed collateral retains it for an unreasonably long period without disposing of it, he is deemed to have retained the collateral in satisfaction of the debt which it secures and is thus precluded from suing on the note, regardless of whether he has notified the debtor that he is so retaining the collateral."); *Service Chevrolet, Inc. v. Sparks*, 99 Wash.2d 199, 204, 660 P.2d 760 (1983) ("[T]here must ... be a 'reasonable' limit to the length of time a secured party is permitted to hold collateral before it is deemed to have exercised its right to have retained that collateral in satisfaction of the obligation.").

A minority of courts, however, have refused to force an election of strict foreclosure "upon an unwilling secured creditor." *Lamp Fair*, 888 F.2d at 177. As explained in *Schmode's, Inc. v. Wilkinson*, 219 Neb. 209, 361 N.W.2d 557, 558 (1985), "this view ... seems to be premised on the notion that since the Code provides a specific method for indicating that the secured party has elected to retain the collateral to satisfy the obligation, such an election cannot be implied from conduct not specified by the Code." The Nebraska Supreme Court in *Schmode's* refused to follow the minority view, explaining that "a secured party ought not be allowed to penalize a debtor by asserting the secured party's own failure to give the notice contemplated by § 9505(2)."

The interests in protecting a debtor from a secured creditor who retains the collateral for a lengthy period of time or takes action inconsistent with the disposition option, leaving the debtor dangling as to whether a deficiency claim will be pursued, are indeed compelling. But the statutory requirement of a written notice of the election of strict foreclosure does not afford room for an implied strict foreclosure. The written notice mandate establishes a bright, unequivocal line for ascertaining when a secured creditor has opted to retain the collateral in full satis-

faction of the debt. The requirement of written notice also serves to give the debtor an opportunity to redeem the property. The legislature having established the written notice condition to serve these important purposes, a court should be loathe to imply an election

■ If there were no other avenue for protecting the debtor when a secured creditor retains the collateral for an extended period of time, recognition of an implied election of strict foreclosure may nonetheless be warranted. The obligation that a creditor dispose of collateral in a "commercially reasonable" manner, however, affords the requisite protection to the debtor. As explained in one treatise:

> [T]he situation is properly analyzed under subsection 9–504(3), which imposes the standard of commercial reasonableness on the secured party's disposition. Assuming that the retention of collateral in such a case would be commercially unreasonable, then the secured party's liability under subsection 9–507(1) should be invoked rather than an involuntary strict foreclosure. Of course, the result under subsection 9–507(1) may indeed be the same as the result under an involuntary strict foreclosure, that is, the secured party may keep the collateral but lose any right to a deficiency judgment.[17]

*Hawkland, Lord & Lewis*, UCC series § 9–505:09 (1986).

**17.** In pertinent part, § 9–507(1), codified in Pennsylvania at 13 Pa.Cons.Stat.Ann. § 9507(a), provides:
> If it is established that the secured party is not proceeding in accordance with the provisions of this chapter disposition may be ordered or restrained on appropriate terms and conditions. If disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this chapter.

**18.** In *First National Bank of Pennsylvania v. Cole*, 291 Pa.Super. 391, 435 A.2d 1283 (1981), the court held that *assuming* Pennsylvania law would recognize an implied election of strict foreclosure, the debtor was not able to avoid a deficiency judgment because it had failed to present any evidence that the secured creditor "man-

I believe that such an approach adequately balances the interests of both the secured creditor and the debtor. A secured creditor, such as Meridian, who has expressed an intent to pursue a deficiency claim while holding the collateral for sale, does not have an involuntary strict foreclosure forced upon it. The debtor, on the other hand, has the ability to have any deficiency claim voided where the secured creditor has not acted in a commercially reasonable manner with respect to the time of the disposition of the collateral and is unable to rebut the presumption that the value of the collateral equaled the indebtedness. Accordingly, the implied strict foreclosure theory will be rejected.[18]

### 2. The "Unreasonable Delay" Theory

In this case, the Solfanellis presented unrebutted evidence that Meridian's retention of the FEB shares for 11 months was inconsistent with industry standards and was commercially unreasonable. (N.T. 1/10/95 at 60–65, 110–12.) Meridian's own expert, in response to the question of whether he was "giving an opinion one way or the other as to whether it was reasonable for ... Meridian ... not to have sold the stock in 1991," stated that he was "not giving an opinion." (N.T. 1/11/95 at 217.) On the contrary, he indicated that had Meridian asked him for his opinion during 1991, he would have advised Meridian to consider selling the stock. (*Id.* at 212, 214.)

ifested an intention to retain the collateral in satisfaction" of the indebtedness. Id. at 394, 435 A.2d at 1284. Other courts have similarly held that conduct of a debtor indicative of an intent to retain the collateral in satisfaction of the indebtedness is required to imply a strict foreclosure election. *See, e.g., Nelson v. Armstrong,* 99 Idaho 422, 582 P.2d 1100, 1107–08 (1978). In this case, the Solfanellis contend that Meridian's assertion of "every aspect of ownership" of the stock affords the requisite indicia of an intent to retain the collateral in satisfaction of the Solfanellis' obligation. *But cf. LaRoche,* 969 F.2d at 1303 (re-registration of pledged securities did not indicate intent to retain stock and waive deficiency). In light of my finding that an implied election theory is not warranted, there is no need to determine whether mere assertion of ownership is sufficient to trigger an involuntary strict foreclosure.

In February of 1991, prior to an event of default, Meridian had requested Joseph Solfanelli to sell his FEB stock, contending that the then-prevailing price would have been sufficient to pay off the loan. At that time, the FEB stock was selling at $16.00 per share. At trial, evidence was presented that FEB stock traded for at least $16.00 per share on more than 30 days after the filing of the Certificate of Default. Evidence was also presented that, shortly after a Meridian evaluation of FEB conducted in August of 1991 that was essentially negative, FEB shares were trading for at least $16.00 on a number of days, reaching $17.75 in early September. (*Id.* at 204–07.) This evidence prompted the bankruptcy court to observe that "there may have been opportunities to have sold the stock for greater than the amount of the debt between March 18, 1991 and the date of the ultimate sale in late February and early March of 1992." *In re Solfanelli*, 206 B.R. at 710.

The bankruptcy court held, however, that the Solfanellis' failure to request a sale of the shares precluded a finding that Meridian "breached its duty of reasonable care." *Id.* In holding that the failure of the debtor to request the sale of the collateral precludes an examination of the commercial reasonableness of the timing of the sale, the bankruptcy court relied upon *FDIC v. Caliendo*, 802 F.Supp. 575, 583 (D.N.H.1992). In *Caliendo,* the market value of the stock exceeded the indebtedness. The *Caliendo* court noted that where the loan is over-collateralized, the debtor must make a reasonable request of the creditor to sell the stock. In the absence of such a request, there is no breach of duty to the debtor. In this case, by way of contrast, the value of the Solfanellis' shares did not exceed the indebtedness. Thus, under the circumstances prevailing in this case, the obligation of the secured creditor to dispose of the collateral in a commercially reasonable manner is not triggered by a demand of the debtor.

In rejecting the undue delay theory, the bankruptcy court in this case also relied upon the general proposition that a pledgee does not owe a duty to the pledgor to preserve the market value of stock. *In re Solfanelli*, 206

B.R. at 710. These cases arise under Section 9207 of the UCC, and have no application here.

Instead, the operative provision here is Section 9504(c), which mandates that "*every aspect of the disposition* including the method, manner, *time,* place and terms *must* be commercially reasonable." 13 Pa.Cons. Stat.Ann. § 9504© (emphasis added). As explained in *United States v. Willis,* 593 F.2d 247, 259 (6th Cir.1979):

> The relevant test is ... whether every aspect of the sale is commercially reasonable. It is commercially reasonable if the party (1) acts in good faith, (2) avoids loss, and (3) makes an effective realization. Furthermore, the party may obtain court approval if he (4) sells in the usual manner in a recognized market, or (5) sells at the current price in a recognized market, or (6) sells in conformity with reasonable commercial practices among dealers in the type of property.

Furthermore, "when a creditor decides to liquidate the assets of the primary obligor, it must act as the obligor's fiduciary and make a sincere effort to obtain the full market value for the property." *United States ex rel. Small Business Admin. v. Chatlin's Department Store, Inc.,* 506 F.Supp. 108, 111 (E.D.Pa.1980). In short, the secured creditor's discretion is not, contrary to Meridian's position, unfettered. *Willis,* 593 F.2d at 259. "Whatever discretion it had in choosing the [timing] of [the] sale was limited by its good faith duty to maximize the proceeds upon sale of the collateral." *Id.; see also In re Kaplan,* 143 F.3d 807, 818 (3d Cir.1998) ("one purpose of the implied covenant of good faith is to 'check the exercise of a party's discretion under a contract' ").

Where, as here, the debtor questions the commercial reasonableness of the sale, the burden is on the secured party "to show that, *under the totality of circumstances,* the disposition of collateral was commercially reasonable." *Savoy v. Beneficial Consumer Discount Co.,* 503 Pa. 74, 468 A.2d 465, 467 (1983) (emphasis added). In this case, the only evidence Meridian supplied to justify its delay in effecting the sale of the FEB shares was that Joseph Solfanelli was

opposed to any sale and had threatened to sue it. The bankruptcy court did not make any finding on whether such a threat had been made. The Solfanellis presented evidence that at no time from March of 1991 until the end of January of 1992 did Joseph Solfanelli request that Meridian not sell the FEB shares. Moreover, Meridian's justification rings hollow in light of its actions in February and March of 1992. And even more important is the absence of any evidence that Meridian took any action whatsoever to effectuate a sale of the shares during 1991. It did not retain a broker. It did not set into place any plan for the disposition of shares at a certain price. It simply sat and waited. The fact that a better price could have been obtained by a sale of the shares at a different time is not, of course, dispositive of the question of whether Meridian acted in a commercially reasonable manner. *See* 13 Pa.Cons.Stat.Ann. § 9507(b). The fact that there were a number of occasions during 1991 when Meridian could have sold the FEB shares for an amount which, when combined with other collateral, undoubtedly covered the indebtedness, however, is highly probative on the issue of commercial reasonableness. *Willis,* 593 F.2d at 259. When coupled with the failure of Meridian to set in motion any effort to market the shares in 1991 and its meager justification of fear of suit, contrasted with the testimony of the only expert who expressed an opinion on the issue, the evidence of Meridian's deliberate inaction compels the conclusion that Meridian's delay was commercially unreasonable.

 Where, as here, a secured party has acted in a commercially unreasonable manner, it shoulders the burden of rebutting the presumption that the value of the collateral equaled the indebtedness. *Savoy,* 468 A.2d at 467. Meridian did not present any evidence that the market price of the FEB shares during various time frames in 1991 was inadequate to satisfy the indebtedness. Under these circumstances, the bankruptcy court erred in not holding that the Solfanellis' indebtedness was satisfied by virtue of the commercially unreasonable delay in the sale.[19]

### 3. Meridian's Handling of the Claim Against KB & W

The bankruptcy court reached the same result, extinguishing the Solfanellis' indebtedness, for a different reason. It found that Meridian had acted in a commercially unreasonable manner with respect to the settlement of the claim against KB & W. Meridian contends that this ruling was erroneous.

Meridian's challenge to the bankruptcy court ruling on Count VII of the Amended Complaint rests on the premise that a sale of the FEB shares at the NASDAQ bid price was conclusively commercially reasonable. In this regard, the Stipulation and Security Agreement provided that the sale of the FEB shares "either through a registered broker in the market or in a private sale at or higher than the NASDAQ 'bid' amount shall constitute a commercially reasonable sale...." KB & W purchased more than 100,000 shares of the FEB stock at the NASDAQ bid price prevailing on February 18, 1992.

 The duty of commercial reasonableness, however, is *not* limited to price consideration. *Every* aspect of the sale, including the method, manner and terms, must be commercially reasonable. 13 Pa.Cons.Stat. Ann. § 9504(c). In this case, the broker retained by Meridian "flipped" the overwhelming majority of shares by buying at a low price on February 18th and selling at a

19. The bankruptcy court had concluded that the Solfanellis had cured the events of default in March of 1991. This finding does not alter the result here. Meridian claims that it owned the FEB shares as of March 18, 1991, and this claim triggered its fiduciary obligations and duty of commercial reasonableness. Moreover, the bankruptcy court's conclusion is not supported by the Stipulation and Security Agreement, which did not contain a "cure" provision. The bankruptcy court's application of promissory estoppel principles to find a cure is flawed in that the action that Mr. Solfanelli was purportedly induced to take—the sale of his interest in BBB Cellular—was already contractually required. If, however, the events of default underlying the March 1991 Certificate of Default had been cured, as the bankruptcy court found, then the automatic stay remained in place until and unless another Certificate of Default was filed. Thus, under the bankruptcy court's reasoning, since another Certificate of Default was not filed, the sale of the securities in February of 1992 was not authorized.

significantly higher price on February 20th. Meridian, itself, considered KB & W's conduct so questionable that it immediately and aggressively pursued a claim against it. As the Solfanellis argue, the fact that Meridian challenged KB & W's conduct supports an inference that Meridian itself acknowledged "that the mode of sale it employed and the price received were not commercially reasonable, and that Meridian did not maximize the value received for the [FEB] stock." (Brief in Opposition to Brief of Appellant (Dkt. Entry at 19) at 17.) Furthermore, the fact that Meridian credited the Solfanelli indebtedness with the proceeds of the settlement it negotiated with KB & W buttresses the conclusion that KB & W's defalcations became part of the disposition of the collateral securing the indebtedness.

It is undisputed that Meridian did not notify the Solfanellis of the questionable conduct of KB & W. Meridian contends that under the Stipulation and Security Agreement it was not required to provide any notice whatsoever to the Solfanellis with respect to the disposition of the FEB stock. As the bankruptcy court observed, however, "because it impacted not only Solfanelli but the entire bankruptcy estate, the true nature of this transaction [involving KB & W] should have been disclosed to the Debtors." *In re Solfanelli*, 206 B.R. at 711. Furthermore, Meridian's disposition of the stock was governed by the duty of good faith and fair dealing implicit in every contract. *See In re Kaplan, supra.* The questionable conduct of Meridian's broker was sufficiently outside the ordinary course of anticipated events with respect to the sale that good faith and fair dealing demanded that the Solfanellis be apprised of this development. As the bankruptcy court further observed, "resolving a claim against [KB & W] without consulting the beneficial owner of the stock violated the

reasonable expectations of the parties." *In re Solfanelli*, 206 B.R. at 711.

Rather than notifying the Solfanellis of the pursuit of a claim against KB & W, defendant attempted to mask the transaction. The bankruptcy court's finding that Meridian "blatantly and falsely stated that the last credit to the account was for $150,000 as a result of the 'sale of additional [FEB] stock,'" *id.* at 711, is amply supported by the record and is not clearly erroneous. Under these circumstances, the bankruptcy court was justified in concluding that "falsely claiming that these proceeds were received as a result of the additional stock aggravated the initial impropriety [in failing to provide notice to the Solfanellis] and confirms ... that the disposition of the collateral was not performed in a commercially reasonable manner." *Id.* at 711–12.

Meridian complains that the bankruptcy court erred in finding that the value of the collateral equaled the indebtedness. It was Meridian's obligation, however, to show otherwise. While it contends that KB & W yielded only a $300,000 profit from its questionable conduct, it did not present any evidence in support of that assertion. Its own internal records, produced as Joint Trial Exhibit, suggested a $500,000 profit. Nor did Meridian present any evidence that it undertook to assess the value of a claim against KB & W, including the value of any claim for punitive damages. Under these circumstances, the bankruptcy court did not err in deeming the Solfanelli indebtedness satisfied.[20] Accordingly, the judgment entered on Count VII will be affirmed.[21]

**B. Meridian's Attachment of Bank Accounts Containing Post–Petition Funds**

The bankruptcy court found that the February 1992 attachment of accounts containing

20. As noted above, this determination inures to the benefit of Natalie Solfanelli as well as Joseph Solfanelli, and the bankruptcy court will be directed on remand to enter judgment in her favor on Count VII as well.

21. The Solfanellis also cross-appealed the bankruptcy court's ruling with respect to its securities fraud claim. The Solfanellis contend that they were damaged in the amount of the bank's deficiency claim as a result of the actions of the bank in connection with the sale of the stock. In light of the determination that Meridian acted in a commercially unreasonable manner, thereby extinguishing any deficiency claim, the securities fraud cause of action would appear to be superfluous. In any event, the bankruptcy court's conclusions that the Solfanellis failed to demonstrate detrimental reliance on alleged fraudulent conduct and did not show any economic harm as a result thereof are not clearly erroneous.

post-petition funds of the Solfanellis was a willful violation of the automatic stay, entitling Natalie Solfanelli to nominal damages of $1.00 and punitive damages of $10,000. The bankruptcy court also found that the attachment of the accounts amounted to an abuse of process.

The premise for Meridian's challenge to these determinations is that the automatic stay had terminated with the filing of the Certificate of Default in March of 1991, thereby enabling Meridian to exercise all remedies available to a judgment creditor. The bankruptcy court rejected this argument on the grounds that Meridian's pre-petition lien could not extend to the debtors' post-petition earnings. *See* 11 U.S.C. § 552(a). Meridian counters by claiming that the Stipulation and Security Agreement made post-petition earnings part of Meridian's "cash collateral."[22] Thus, Meridian asserts:

> The parties' agreement that the Solfanellis' cash was part of Meridian's collateral overrode the exclusion of post-petition earnings from estate property, *see* 11 U.S.C. § 541(a)(6). The stipulated cash collateral status of post-petition funds rendered 11 U.S.C. § 552 inapplicable. [Meridian Brief in Chief (Dkt. Entry 17) at 27.]

The unsound premise of Meridian's argument is that the relief from the automatic stay extended to all cash collateral. As argued by the Solfanellis, the Stipulation and Security Agreement "permitted Meridian . . . only to enforce its claim, if any, against the *Collateral* given to Meridian . . . by plaintiffs in the Stipulation and Security Agreement and as defined therein." (Brief in Opposition to Meridian Appeal (Dkt. Entry 19) at 25.) The term "Collateral" was not defined so as to encompass cash or "Cash Collateral." Moreover, the Stipulation and Security Agreement specifically authorized the Solfanellis "to use Cash Collateral in the ordinary course of their businesses and for ordinary and customary living expenses" throughout the term of the Stipulation, subject to the terms and conditions of the Stipulation. Upon the filing of a Certificate of Default, Meridian was authorized "to proceed with the exercise of all remedies available to it in respect of the Existing Indebtedness and Collateral. . . ." No specific mention was made of exercising remedies with respect to Cash Collateral. Nor did the Stipulation provide for a lien on post-petition earnings. By way of contrast, the Stipulation granted to Meridian a first priority security interest and replacement lien in tax refunds, as well as a security interest in other specifically identified property. The failure to specify the extension of a security interest to post-petition earnings that otherwise would not be part of the bankruptcy estate confirms the Solfanellis' understanding that post-petition earnings could not be attached. In light of the absence of any express provision in the Stipulation and Security Agreement overriding the Bankruptcy Code provisions, the filing of a Certificate of Default did not authorize the Bank to attach post-petition funds. Accordingly, the bankruptcy court did not err in finding a violation of the automatic stay.[23]

Subsection (h) of 11 U.S.C. § 362 provides that "[a]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, includ-

---

**22.** The Stipulation and Security Agreement defined Cash Collateral as set forth in Section 363(a) of the Bankruptcy Code, which defines cash to mean, *inter alia*, cash "whenever acquired." 11 U.S.C. § 363(a).

**23.** The bankruptcy court sustained the Solfanellis' abuse of process claim on the reasoning that an attachment of post-petition funds was unauthorized by any of the documents presented in the case. *In re Solfanelli*, 206 B.R. at 704. This ruling misperceives the gravamen of the abuse of civil process tort. The essence of such a claim is that proceedings are used for a purpose not intended by the law. *Rosen v. Tesoro Petroleum Corp.*, 399 Pa.Super. 226, 582 A.2d 27, 33, *app.*

denied, 527 Pa. 636, 592 A.2d 1303 (1991). "Abuse of process occurs when the legal process is utilized for some unlawful purpose, and not for which it was intended." *Lessard v. Jersey Shore State Bank*, 702 F.Supp. 96, 99 (M.D.Pa.1988). In this case, the process utilized by Meridian was employed for its intended purposes—to seize funds claimed by a judgment creditor. The fact that the Stipulation and Security Agreement did not authorize the attachment does not alter the conclusion that the process was indeed employed for its intended purpose. Accordingly, the judgment in favor of Natalie Solfanelli and against Meridian on Count II of the Amended Complaint will be reversed.

ing costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." An award of damages is appropriate where, as here, the defendant knew of the automatic stay and the actions which violated the stay were intentional. *See In re Atlantic Business & Community Corp.*, 901 F.2d 325, 329 (3d Cir.1990). In this case, Meridian knew that the automatic stay would be lifted only to the extent authorized by the Stipulation and Security Agreement. Since the agreement did not authorize pursuing actions against non-bankruptcy estate property, such as the post-petition earnings in the garnished accounts, and Meridian's actions in attaching the accounts were undoubtedly intentional, a willful violation has been established.

 The bankruptcy court's factual finding that Natalie Solfanelli was injured by virtue of the violation of the automatic stay is not clearly erroneous.[24] Accordingly, the bankruptcy court was justified in awarding nominal damages in the amount of $1.00 and attorneys' fees "in advancing this litigation as it relates to the violation of the automatic stay...." *In re Solfanelli*, 206 B.R. at 703.

 The bankruptcy court's award of punitive damages of $10,000 rested on its assessment of the pertinent factors, including:

● The nature of the creditor's conduct;

● the extent of harm suffered by the plaintiff;

● any provocation by the plaintiff; and

24. The bankruptcy court, while not finding any pecuniary harm, determined that Natalie Solfanelli suffered embarrassment, humiliation and mental anguish as a result of the attachment of the accounts.

25. The Solfanellis contend that the violation of the automatic stay as well as Meridian's failure to withdraw its judgment as to Natalie Solfanelli warrant rescission of the release executed in connection with the Stipulation and Security Agreement. In its reply brief, Meridian notes that the rescission claim is now moot inasmuch as the causes of action asserted by the Solfanellis with respect to conduct of Meridian antedating the Stipulation and Security Agreement were decided in favor of Meridian in the bankruptcy court's March 1998 ruling. The Solfanellis did not appeal that decision. Accordingly, Meridian's assertion that the rescission claim is moot, which is not challenged by the Solfanellis, has

● the creditor's ability to pay.

*See, e.g., Federal Home Loan Mortgage Corp. v. McCormack*, No. 96–81–SD, 1996 WL 753938, at *6 (D.N.H. Sept. 3, 1996); *In re Sumpter*, 171 B.R. 835, 845 (Bankr. N.D.Ill.1994); *In re M.J. Shoearama, Inc.*, 137 B.R. 182, 190 (Bankr.W.D.Pa.1992). The bankruptcy court's assessment of these factors does not reflect an abuse of discretion. Moreover, its conclusion that Meridian acted in an overzealous manner and that "there is absolutely nothing in the Plaintiff's conduct ... that would justify [Meridian's] disregard of the automatic stay" fully supports the decision to award punitive damages. Finally, the amount awarded was modest. Accordingly, the entry of judgment in favor of Natalie Solfanelli and against Meridian for $10,000 in punitive damages will be affirmed.[25]

### C. *The Order Authorizing Payment of 1994 Federal Taxes*

Meridian acknowledges that unpaid federal income taxes represent an unsecured priority claim under 11 U.S.C. § 507(a)(8). Its challenge to the order authorizing payment of the federal income taxes for the year 1994 rests upon the assertion that it is a secured creditor. In light of the determination that the Solfanellis' indebtedness to Meridian has been discharged, there is no foundation for secured creditor status. Accordingly, the October 27, 1997 Order authorizing the payment of the 1994 federal income taxes will be affirmed.[26]

merit. In any event, the bankruptcy court correctly concluded that the terms of the Stipulation and Security Agreement foreclosed the Solfanellis from seeking to set aside the release based upon Meridian's alleged violation of that agreement and the automatic stay.

26. Meridian also contests the transfer of the proceeds from the settlement of the state court litigations to the Solfanellis as debtors-in-possession. Meridian contends that affording the Solfanellis access to the settlement proceeds effects a *de facto* reorganization plan. Meridian also notes, however, that by verbal order on November 19, 1997, the bankruptcy court stayed further disbursement of the settlement proceeds and, by Opinion and Order dated February 17, 1998, the bankruptcy court denied the Solfanellis' motion for access to the settlement proceeds. (Meridian Brief (Dkt. Entry 15) at 5 n. 4.) No appeal was taken from this decision. Under

## D. The Bankruptcy Court's Approval of Disbursements for Attorneys' Fees and Expenses

The bankruptcy court approved Attorney Mannino's appointment to represent Joseph Solfanelli in the state court litigations under a contingent fee agreement. The fee agreement called for Mannino to be reimbursed expenses and to receive 25 percent of the net recovery in the state court litigations.

■ Bankruptcy Code Section 328(a) provides:

> The trustee, or a committee appointed under Section 1102 of this Title, with the court's approval may employ or authorize the employment of a professional person under Section 327 ... of this title, ... on any reasonable terms and conditions of employment, including ... on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of fixing of such terms and conditions.

The bankruptcy court concluded that, consistent with the approved fee arrangement, a fee of $350,000, representing 25 percent of the net recovery of $1,400,000, was warranted.[27] This decision fell within the bankruptcy court's ample discretion.

■ The bankruptcy court, however, reduced the award by $35,000 in light of Mannino's failure to disclose a retainer paid to him following bankruptcy court approval of his retention.[28] Meridian argues that the $35,000 sanction for failure to disclose receipt of the retainer was too lenient. It argues that the failure to disclose the $35,000 retainer, in violation of Bankruptcy Rule 2016, warrants forfeiture of the entire fee of $350,000.

■ Contrary to Meridian's position, there is no automatic forfeiture rule for an attorney's violation of a bankruptcy law disclosure requirement. Instead, the bankruptcy court is vested with wide discretion to determine the appropriate sanction. See In re Crivello, 134 F.3d 831, 839 (7th Cir.1998) ("[I]t is not our role to reduce the discretion the Code affords bankruptcy courts by carving out an exception that requires the denial of fees if a professional willfully fails to disclose."); In re Park–Helena Corp., 63 F.3d 877, 882 (9th Cir.1995), cert. denied, 516 U.S. 1049, 116 S.Ct. 712, 133 L.Ed.2d 667 (1996);[29] In re Leslie Fay Cos., Inc., 175 B.R. 525, 538 (Bankr.S.D.N.Y.1994). In this case, the $35,000 sanction imposed by the bankruptcy court was well within its discretion. Accordingly, Meridian's challenge to the award of counsel fees and expenses will be denied.[30]

## III. CONCLUSION

For all the foregoing reasons, the bankruptcy court's judgments on Counts I, III, IV and VII of the Amended Complaint will be affirmed. Its judgment on Count II, concerning abuse of process, will be reversed. The matter will be remanded to the bankruptcy court to enter judgment in favor of Meridian on Count II and in favor of Natalie

these circumstances, there is no basis for addressing Meridian's contentions. Instead, the bankruptcy court should address these arguments in the first instance.

27. Expenses were estimated to total $100,000.

28. At the time of his retention, Mannino had disclosed receipt of a $15,000 retainer from an unnamed "third party." Failure to disclose the identity of the party paying the retainer constituted a violation of 11 U.S.C. § 329. Because the bankruptcy court had approved the hiring of Mannino notwithstanding this violation, the bankruptcy court elected to allow him to retain that payment.

29. In Park–Helena, the appellate court affirmed the denial of fees where the bankruptcy court found the disclosure violation to have been willful. No such finding was made here.

30. Meridian suggests that the failure of Mannino to disclose a conflict of interest that arose after January 1, 1997 by virtue of his firm's acquisition of another law firm also warrants denial of compensation. Meridian acknowledges, however, that it did not raise this issue in the bankruptcy court notwithstanding the fact that the adversary proceeding continued in the bankruptcy court until March of 1998. Under these circumstances, I decline to address an issue not raised below.

Solfanelli, as well as Joseph Solfanelli, on Count VII.